UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

In re:

SANDY PINES, LLC,

Debtor.

Chapter 11
Case No. 26-20038

### BANGOR SAVINGS BANK'S OBJECTION TO DEBTOR'S
### MOTION FOR AUTHORITY TO USE CASH COLLATERAL

Bangor Savings Bank (the "Senior Lender") hereby objects to the *Motion of Debtor: (A) For Entry of an Order: (I) Authorizing the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Authorizing Debtor to Pay Prepetition Merchant Processing Fees; (IV) Authorizing Debtor to Maintain Customer Refund Policy; and (V) Granting Related Relief* [Dkt. No. 3] (the "Motion"), as follows:[1]

1. Information about the background of the Senior Lender's relationship with Sandy Pines, LLC (the "Debtor"), including the indebtedness owed by the Debtor and the Senior Lender's liens, is set forth in more detail in *Bangor Savings Bank's Motion for: (A) Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d); or (B) In the Alternative, Dismissal Pursuant to 11 U.S.C. § 1112(b); or (C) In the Alternative, Appointment of a Trustee Pursuant to 11 U.S.C. §§ 1104(a) and 1112(b)* [Dkt. No. 14] (the "Senior Lender Motion"). The Senior Lender Motion is incorporated herein by reference.

2. The Motion does not demonstrate that the interests of the Senior Lender in Cash Collateral are adequately protected. The Debtor proposes to grant the Senior Lender Adequate Protection Liens and Continuing Liens in the post-petition Cash Collateral, and argues that this constitutes adequate protection because Cash Collateral increases over the relevant period under the analysis set forth in In re Dynaco Corp., 162 B.R. 389 (Bankr. D.N.H. 1993). This analysis is flawed for several reasons.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1

3. First, the Budget shows weekly aggregate revenues of $523,730.00. However, the Motion discloses that most or all of these revenues are subject to the Refund Policy, meaning that they represent prepayments or deposits in the amount of 50% of the contract amount and may need to be refunded until 14 days prior to the reservation. Moreover, the Debtor discloses in the Motion that it uses – and has been using – revenues subject to the Refund Policy prebankruptcy to fund operational expenses. Thus, the revenues in the Budget may be largely and entirely illusory, which makes the lack of any projected refunds in the Budget all the more concerning. It is difficult for the Debtor to maintain that Cash Collateral is likely to increase over the relevant period when the revenues in the Budget are subject to such uncertainty, and when the Debtor's own projections fail to account for the impact of the Refund Policy.

4. Second, the Budget demonstrates the Senior Lender's concerns about the viability of the Debtor's operations and its ability to effectively reorganize in chapter 11 are well founded. The Budget shows operating losses as soon as operations commence in weeks 12 and 13. These operating losses are projected even without accounting for the impact of the Refund Policy on revenues and without any provision for payment of debt service to the Senior Lender and other secured parties. Thus, as set forth in the Senior Lender Motion, the Debtor is unlikely to be able to effectively reorganize within a reasonable period of time, which begs the question of why the Debtor should be authorized to use Cash Collateral to bridge itself to future failure. Instead, the Senior Lender should be allowed to complete its pending foreclosure and transition the property to a new owner-operator in advance of the 2026 season.

5. Third, the Senior Lender has significant concerns about the Budget:

    a. The proposed variance for aggregate expenses is 25%, which is far too large. In most chapter 11 cases, a 5-10% variance is authorized. In combination with other issues described herein, the Senior Lender questions the reliability of the Budget and the Debtor's ability to accurately render projections of revenues and expenses.

    b. The proposed variance only applies to expenses – not to revenues. Given that the Debtor's reservations and resulting revenues may diminish based on its ill-advised decision to file for chapter 11 immediately before the 2026 operating season, and the impact of the Refund Policy, any variance should apply to both revenues and expenses.

2

  c. Beginning in week 4 of the Budget, the Debtor begins incurring new wages and benefits not previously budgeted. A footnote to the Budget partially explains this new expense, but does not disclose (i) why these new employees are necessary only now that the Debtor has filed for bankruptcy and whether their addition is an ordinary course transaction consistent with prior years, and (ii) whether these individuals are insiders of the Debtor.

  d. Over 14% of the projected expenses are classified as "miscellaneous expenses." If the Debtor cannot articulate what these "miscellaneous expenses" are, how can they be actual and necessary expenses (let alone expenses "necessary to avoid immediate and irreparable harm" during the preliminary period)?

  e. The Budget shows nearly $20,000 being paid for "management fees." As with employee wages, the Senior Lender is concerned that these fees are merely a mechanism to compensate insiders of the Debtor.

  f. The Budget projects over $30,000 of professional fee payments. The Senior Lender objects to these payments. The Debtor should not be allowed to dissipate Cash Collateral for this reason when (i) the Debtor projects losses immediately upon commencing its seasonal operations and (ii) the Budget provides no provision for paying anything to the Senior Lender while its secured claim grows by $200,000 plus legal fees over the relevant projection period.[2]

6.  If the Motion is granted on an interim basis, the Senior Lender requests certain modifications in the proposed order:

  a. The interim period of authority should be short and be on a parallel track with the Senior Lender Motion. Another interim hearing should be held on March 12, 2026, and the future schedule should be coordinated with the Senior Lender Motion.

  b. If granted, the Motion proposes to use proceeds of Cash Collateral – which is the Senior Lender's collateral – to fund operations pursuant to the Budget. The Senior Lender should not be at risk of further surcharge under Bankruptcy Code section 506(c) during the interim period, so the order should include a limited waiver of surcharge.

  c. The order should include a ratification of the Senior Lender's debt, loan documents, and liens. The Debtor has signed two forbearance agreements with

---

[2] MutualOne Bank (the "Junior Lender") has also objected to the Motion [Dkt. No. 32]. In paragraph 15 of its objection, the Junior Lender argues that it is not adequately protected because "the Debtor's failure to budget payment of the $64,106 due [the Junior Lender] each month . . . will cause an immediate and precipitous diminution in the value of [the Junior Lender's] secured claim." While the Senior Lender generally agrees with the Junior Lender's objections and shares its concerns, the best way to prevent the objectionable erosion of the Junior Lender's secured claim is for the Debtor to pay the Senior Lender's post-petition interest and legal fees on a current basis in the Budget. This will prevent the Senior Lender's secured claim from growing under Bankruptcy Code section 506(b).

    similar ratifications, so including similar protections here poses little risk as long as the ratification is limited to the debtor-in-possession and its successors, but not other parties-in-interest.

    d.   In light of the nature of the Debtor's hospitality business, the definition of "Continuing Liens" should be revised consistent with Bankruptcy Code section 552(b)(2), which Congress enacted to protect the post-petition liens of secured parties like the Senior Lender: "In addition to the Adequate Protection Liens to the Prepetition Lienholders, pursuant to § 552 of the Bankruptcy Code, the Prepetition Lienholders shall continue to hold liens, rights as assignee, and/or security interests in any and all proceeds, products, offspring, profits, and rents, fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in lodging properties acquired by the Debtor after the Petition Date to the same extent and validity, and in the same priority, as the Prepetition Lienholders held liens, rights as assignee, and/or security interests in the Debtor's assets as of the Petition Date (the "**Continuing Liens**")."

Dated: March 2, 2026                          Respectfully submitted,

                                                   */s/ Jeremy R. Fischer*
                                                   Jeremy R. Fischer
                                                   **PRETI FLAHERTY**
                                                   One City Center, P.O. Box 9546
                                                   Portland, Maine 04112-9546
                                                   (207) 791-3000
                                                   jfischer@preti.com

                                                   *Counsel to Bangor Savings Bank*

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing document has been served via CM/ECF on all parties requesting CM/ECF notice.

Dated: March 2, 2026                          */s/ Jeremy R. Fischer*