## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

_____

In re:

SANDY PINES, LLC,                                   Chapter 11

        Debtor.                                    Case No. 26-20038

_____

### RESPONSE AND LIMITED OBJECTION OF SACO BIDDEFORD SAVINGS INSTITUTION TO DEBTOR'S MOTION FOR USE OF CASH COLLATERAL

Saco Biddeford Savings Institution ("SBSI"), by and through undersigned counsel, hereby files this Response and Limited Objection (the "Response") to the Motion of Debtor for Entry of an Order: (I) Authorizing the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Authorizing Debtor to Pay Prepetition Merchant Processing Fees; (IV) Authorizing Debtor to Maintain Customer Refund Policy; and (V) Granting Related Relief (the "Motion"), and states as follows:

### I.      Background

1.      SBSI is a creditor of the Debtor pursuant to that certain Fixed Rate Commercial Promissory Note dated April 1, 2024 in the original principal amount of $1,108,575.00, together with a Commercial Security Agreement and related loan documents (collectively, the "Loan Documents"), a copy of which is attached hereto as **Exhibit A**.

2.      The Loan Documents grant SBSI a security interest in certain personal property of the Debtor, including nine (9) park model RV units together with additions, accessories, replacements, and proceeds thereof (the "Collateral").

3.      SBSI also holds a personal guaranty of Timothy Harrington with respect to the Debtor's obligations, a copy of which is attached hereto as **Exhibit B**.

4.      SBSI was served with the Motion and the Notice of Expedited Hearing regarding the Debtor's request to use cash collateral.

## II.      Reservation of Rights Regarding Liens and Collateral

5.      SBSI asserts that it holds liens and security interests in the Collateral and, to the extent applicable, any proceeds thereof.

6.      SBSI expressly reserves all rights with respect to the validity, extent, priority, and perfection of its liens and security interests, and nothing contained herein shall be deemed an admission or waiver of any such rights.

7.      SBSI further reserves all rights and remedies available under the Loan Documents, applicable non-bankruptcy law, and the Bankruptcy Code.

## III.      Cash Collateral Reservation

8.      The Motion identifies Bangor Savings Bank and MutualOne Bank as entities asserting interests in the Debtor's cash collateral.

9.      To the extent any cash collateral constitutes proceeds, products, rents, income, or other value derived from SBSI's Collateral, SBSI asserts that such property constitutes its cash collateral within the meaning of 11 U.S.C. § 363(a).

10.      SBSI does not consent to the use of its cash collateral absent adequate protection acceptable to SBSI or further order of the Court.

## IV.      Adequate Protection

11.      The Debtor continues to possess and utilize property in which SBSI asserts an interest.

12.      The Motion does not provide specific adequate protection to SBSI for any potential diminution in value of its Collateral.

13.      Pursuant to 11 U.S.C. §§ 361 and 363(e), SBSI is entitled to adequate protection to the extent its interests are implicated, including but not limited to:

a. Replacement liens on postpetition proceeds;

b. Maintenance and insurance of the Collateral;

c. Evidence of insurance naming SBSI as loss payee where applicable;

d. Reporting regarding the status, use, and condition of the Collateral; and

e. Such additional protection as may be necessary to protect against diminution in value.

**V.    Limited Objection**

14.    SBSI does not object to entry of an interim order authorizing the Debtor's use of cash collateral solely to the extent:

a.    The order does not authorize use of SBSI's collateral or proceeds without SBSI's consent or further order of the Court;

b.    SBSI's liens, claims, and rights are fully preserved;

c.    SBSI is granted adequate protection to the extent its interests are implicated; and

d. SBSI retains all rights to seek relief from the automatic stay, additional adequate protection, or other appropriate relief.

15. SBSI expressly reserves the right to object to any final cash collateral order.

**VI.    Reservation of Rights**

16.    SBSI reserves all rights, claims, liens, defenses, and remedies available under the Loan Documents, applicable law, and the Bankruptcy Code, including without limitation:

a.     Relief from the automatic stay;

b.    Adequate protection;

c.    Valuation disputes;

d.    Administrative expense claims;

e.    Treatment under any chapter 11 plan; and

      f.      All rights against non-debtor parties, including guarantors.

WHEREFORE, SBSI respectfully requests that the Court:

1. Sustain this Limited Objection to the extent set forth herein;

2. Condition any use of cash collateral to preserve SBSI's rights; and

3. Grant such other and further relief as the Court deems just and proper.

Dated: March 1, 2026       Respectfully submitted,

SACO BIDDEFORD SAVINGS INSTITUTION

By: /s/   *Bridget S. Dornbach*
          Bridget S. Dornbach, Esq.
          Saco Biddeford Savings Institution
          252 Main Street
          Saco, ME 04072
          Telephone: 207-805-4064
          Email: BDornbach@sbsavings.bank

*Counsel to Saco Biddeford Savings Institution*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of March, 2026, I caused a true and correct copy of the

foregoing Response and Limited Objection of Saco Biddeford Savings Institution to Debtor's

Motion for Use of Cash Collateral to be served via the Court's CM/ECF electronic filing system

upon all parties entitled to receive notice in this case.


/s/    *Bridget S. Dornbach*

Bridget S. Dornbach Esq.

# EXHIBIT A
## SACO AND BIDDEFORD SAVINGS INSTITUTION

### FIXED RATE COMMERCIAL PROMISSORY NOTE

$1,108,575.00

Saco, Maine
April 1, 2024

For value received the undersigned ("Borrower") promises to pay to the order of SACO AND BIDDEFORD SAVINGS INSTITUTION, a duly organized and existing corporation under the laws of the State of Maine with its principal place of business in Saco, York County, Maine ("Lender"), the principal sum of ONE MILLION ONE HUNDRED EIGHT THOUSAND FIVE HUNDRED SEVENTY-FIVE & 00/100 DOLLARS ($1,108,575.00) with interest upon the principal sum thereof, or so much thereof as from time to time remains unpaid at the rate of 8.00% per annum, amortized over a period of ONE HUNDRED TWENTY (120) months. Principal and interest payments shall be paid in equal monthly installments of THIRTEEN THOUSAND FIVE HUNDRED FIFTEEN & 25/100 DOLLARS ($13,515.25) with the first installment being due and payable on May, 2024 and subsequent installments being due and payable on the 1st day of each month thereafter, with the entire remaining principal balance together with interest accruals being due and payable ONE HUNDRED TWENTY (120) months from the date hereof. Interest will be calculated daily on the outstanding principal balance of this Note and will be calculated based upon a 360 day year for the actual number of days elapsed in each calendar year.

Late Charges.

If any such payments of principal or interest are not paid when due, the Holder of this Promissory Note may collect a late charge not to exceed five percent (5%) of the overdue payment of principal and interest. Such a late charge will only be charged once on any late payment. A payment shall be deemed late if it is more than fifteen (15) days in arrears.

Prepayment.

The Borrower reserves for itself, and any and all other parties liable hereof, the right to prepay the entire amount of this Note, or any portion thereof, with accrued interest, at any time without the payment of any premium or penalty whatsoever. The monthly payment shall not be suspended or interrupted by reason of any such prepayment.

Relation to Other Laws.

This Promissory Note is subject to the condition that at no time shall the Borrower or any other liable parties be obligated or required to pay interest at a rate that could subject Lender to either civil or criminal liability, forfeiture or loss of principal, interest or other sums as a result of being in excess of the maximum interest rate which Maker or any other liable parties are permitted by law to contract or agree to pay or that Lender is permitted by law to receive. If by the terms of this Promissory Note, Borrower or other liable parties would at any time be required or obligated to pay interest at a rate in excess of such maximum rate, the rate of interest under this Promissory Note shall

be deemed to be immediately reduced to such maximum rate for so long as such maximum rate shall be in effect and shall thereafter be payable at the rate herein provided.

If any obligation or portion of this Promissory Note is determined to be invalid or unenforceable under law, it shall not affect the validity or enforcement of the remaining obligations or portions hereof.

Security/Right of Setoff.

In addition to the protections given to Borrower under this Note, this Note and any extensions, renewals and substitutions hereof shall be deemed secured by the terms of any security agreements, real estate mortgages, pledge agreements, endorsements, guaranties, assignments, bonds, letters of credit and other security documents now held by Lender or granted to Lender simultaneously herewith or in the future whether such be described below as security or not, and any property of Borrower which Lender has a security interest or which may be in the possession of Lender may at any time be treated as collateral for the payment or performance of the obligations of the Borrower. The Lender shall have the right, without notice, to reduce to possession and to set off against any and all obligations and liabilities of Borrower any account, deposit or other property of the Borrower coming into Lender's possession, or any other claim of the Borrower against Lender. In addition, Borrower agrees to provide Lender additional collateral security upon demand when and if Lender in good faith deems itself insecure.

Default/Acceleration.

In case of default in the payment of any installment of interest or of principal and interest due hereunder, including any late charges, and if such default is continued for more than 15 days after the due date thereof; or if Borrower or any other party liable herefor: defaults (not cured within any applicable grace period) under the terms, obligations, covenants, agreements or conditions of the commitment letter, or any security agreement, guaranty or other document that is now or may from time to time hereafter be given as security herefor or in connection herewith (collectively the "Loan Documents"); or defaults under any other obligation of such party to Lender incurred in relation to the loan evidenced hereby (which default is not cured within any applicable grace period) or to any other secured party holding a security interest in the personal property granted as security herefor (which default is not cured within any applicable grace period); or defaults in any subsequent agreements secured by said personal property (which default is not cured within any applicable grace period); or defaults on any obligations of Borrower or any Guarantor hereof to Lender; or is liquidated or dissolved for any reason or undergoes a change in ownership or structure; or shall become insolvent or be unable to pay their debts as they become due; or makes an assignment for the benefit of creditors, files a petition in bankruptcy or petitions or applies to any tribunal for the appointment of a custodian, receiver or trustee for them or with respect to any substantial part of their assets or commences any proceedings under any bankruptcy, reorganization, arrangement, receivership, compensation, liquidation, adjustment of debt, dissolution or liquidation law or statute or any other law or statute of the same kind; or has any such petition or application filed against them or any such proceedings commenced against them which remain undismissed for a period of sixty (60) days or more; or by any act or omission, shall indicate their consent to approval of or acquiesce

in the filing of any such petition, application or proceeding or the appointment of a custodian, receiver or any trustee for them or with respect to any substantial part of their property or suffers any such custodianship, receivership or trusteeship to continue undischarged for a period of sixty (60) days or more; or shall enter into an agreement with one or more creditors for an extension, arrangement or composition of a substantial portion of such parties indebtedness (excluding the incurrence of new obligations and the renewal of obligations in the ordinary course or such parties business); or shall terminate, be dissolved, die, or become a party to any merger or consolidation, then, in any of such cases, Lender shall have the option, in addition to all rights provided in the Loan Documents, to declare due and payable at once the entire principal balance hereof together with accrued interest at the rates hereinabove provided.

Default Interest Rate.

Lender shall have the right to charge interest, payable on demand, on the unpaid principal balance of the loan at an interest rate of three percent (3%) per annum in excess of the rate of interest otherwise payable as provided herein, for any period during which the Borrower shall be in default under any document governing or securing the Loan.

Waivers.

Maker and any other parties liable herefor, whether principal, guarantor, endorser or otherwise, hereby severally waive presentment, demand, notice and protest, and waive all recourse to suretyship and guarantorship defenses generally, including but not limited to any extensions of time for payment or performance which may be granted to Maker or to any other party, any modifications or amendments to this Promissory Note, or any Loan Document, any act or omission to act by or on behalf of Lender, any acceptance of a late payment or a series of late payments by Lender, and a release, disposition or substitution of security, any release of a liable party or parties, and any other indulgences of any type which may be granted by Lender to any or all of Borrowers or any other party liable herefor.

Delay in Enforcement.

Delay or failure on the part of Lender in exercising any rights hereunder shall not operate as a waiver of these or any other rights under this Note.

Place of Payment/Notices.

All payments due hereunder and any notice given by Borrower to Lender shall be addressed to Saco and Biddeford Savings Institution, 50 Industrial Park Road, Saco, Maine 04072, unless written notice of another holder or address be given to Borrower. Any notice by Lender to Borrower shall be addressed to the address of Borrower set forth below, or to such other address of Borrower to which Lender customarily addresses correspondence, unless written notice of another address is given by the Borrower to Lender. Any notice shall be deemed duly given if addressed in the manner herein provided and sent postage prepaid, certified or registered mail, return receipt requested, or delivered by hand and securing a receipt therefore.

Business Purpose.

This Promissory Note evidences a loan intended for business and commercial (excluding agricultural) purposes and the Borrower and all other parties liable herefor hereby represent, warrant and certify that the proceeds hereof shall be used exclusively for such purposes.

Payment of Costs.

Borrower and all other parties liable herefor also agree to pay all costs and expenses of any nature, whether incurred in or out of court, and whether incurred before or after this Promissory Note shall become due at its maturity date, whether before or after declaration of default, including but not limited to reasonable attorneys fees, paralegal fees and costs, which Lender may deem necessary or proper in connection with the collection or satisfaction of the indebtedness evidenced hereby or in the valuation, inspection, administration, supervision, preservation, clean up or protection (including but not limited to the maintenance of adequate insurance) of or realization upon any collateral security herefor, including but not limited to appraisals, environmental assessments and the like. The Lender is authorized, but not required, to pay, at any time and from time to time any or all of said expenses, add the amount of such payment to the amount of the principal indebtedness hereunder and charge interest thereon at the rates specified herein.

Joint and Several Liability.

If there is more than one party signatory hereto, the liability of all such parties, whether principal, guarantor, endorser or otherwise, shall be joint and several.

Submission to Jurisdiction, Service and Venue; Etc.

Borrower hereby submits to the jurisdiction of any state or federal court located within the State of Maine in connection with any suits or proceedings arising from, under or in connection with this Promissory Note or any Loan Document. Borrower further waives to the fullest extent Borrower may effectively do so under or applicable law, any objection Borrower may have, now or hereafter, to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum.

Mergers, Title, Applicable Law.

This Promissory Note is intended by Borrower and Lender as a final expression of the agreement of the parties with respect to the subject matter hereof. Parole (i.e., oral or verbal) extrinsic evidence of any nature, course of prior dealing between the parties, and usage of trade shall not be used to supplement or modify any term hereof. The section titles contained in this Note are for convenience only and shall not affect the construction or meaning of this Note. This Promissory Note shall be construed in all respects in accordance with, and shall be governed by, the laws of the State of Maine.

Amendments to Promissory Note.

The terms and provisions of this Promissory Note shall not in any way be amended or modified unless in writing and signed by all parties hereto.

Statute of Frauds.

Borrower and Lender hereby acknowledge that under Maine law, no promise, contract or agreement to lend money, extend credit, forbear from collection of a debt or make any other accommodation for the repayment of debt for more than $250,000.00 may be enforced in court against Lender unless the promise, contract or agreement is in writing signed by Lender. Accordingly, Borrower cannot enforce any oral promise unless it is contained in a Loan Document signed by the Lender, nor can any change, forbearance or other accommodation relating to the loan, this agreement or any Loan Document be enforced unless it is in writing signed by Lender. Borrower hereby acknowledges that all future promises, contracts or agreements of Lender relating to any other transaction between Borrower and Lender cannot be enforced in court unless they are in writing signed by Lender. Borrower further agrees that the requirement of a writing described in this paragraph shall apply to this Promissory Note and any associated Loan Documents, any extension, modification, renewal, forbearance or any other accommodations relating to this Note or said associated Loan Documents and to any other credit relationship between Borrower and Lender (whether existing now or credited in the future) whether or not the amount involved exceeds $250,000.00.

Collateral and Other Security:

This Promissory Note is secured by a first Security Agreement related to nine (9) Park Model RV Units being a 2024 Elevation 3-107 RV Park Model Unit (VIN - 1E9PT30T6RE683062); a 2024 Elevation 3-122 RV Park Model Unit (VIN - 1E9PT30T5RE683098); a 2024 Elevation 5-111 RV Park Model Unit (VIN - 1E9PF39T6RE683167); a 2024 Elevation 3-107 RV Park Model Unit (VIN - 1E9PT30T0RE683168); a 2024 Elevation 3-122 RV Park Model Unit (VIN - 1E9PT30T9RE683170); a 2024 Elevation 5-104 RV Park Model Unit (VIN - 1E9PF38T8RE683172); a 2024 Elevation 5-104 RV Park Model Unit (VIN - 1E9PF38TXRE683173); a 2024 Elevation 5-108 RV Park Model Unit (VIN - 1E9PF30T1RE683171); and a 2024 Elevation 5-109 RV Park Model Unit (VIN - 1E9PF30T3RE683169), together with certain additions and accessories (collectively the "RV Units"), as perfected by Lender being named as a lienholder on the title certificates for each of the RV Units.

Incorporation of Commitment Letter:

This Promissory Note is governed by the general terms and conditions of a commitment letter dated March 18, 2024 from Saco and Biddeford Savings Institution to Sandy Pines, LLC, which terms and conditions are incorporated herein by reference and which terms and conditions shall survive the loan closing.

[Signature line on next page].

Signed, Sealed and Delivered
In Presence Of

SANDY PINES, LLC

By _____
Timothy Harrington
Its: Operating Manager

# COMMERCIAL SECURITY AGREEMENT

### Nine (9) Park Model RV Units, together with certain additions and accessories

SECURITY AGREEMENT, as of the date referenced herein, between SACO AND BIDDEFORD SAVINGS INSTITUTION, a Maine banking institution having a mailing address of 50 Industrial Park Road, Saco, Maine 04072 (hereinafter, the "Secured Party") and SANDY PINES, LLC, a Maine limited liability company with a mailing address of 2 Livewell Drive, Suite #201, Kennebunk, Maine 04043 and a physical address of 277 Mills Road, Kennebunkport, Maine 04046 (the "Debtor");

WHEREAS, this Commercial Security Agreement (the "Security Agreement" or "Agreement") is entered into with respect to a certain loan (the "Loan") to be made by Secured Party to Debtor, as evidenced by a Promissory Note in the original principal amount of ONE MILLION ONE HUNDRED EIGHT THOUSAND FIVE HUNDRED SEVENTY-FIVE & 00/100 DOLLARS ($1,108,575.00) (the "Note") given by Debtor to Secured Party, and related loan documents, all of even date herewith (the Security Agreement, Note, Guaranty and related loan documents hereinafter collectively the "Loan Documents");

WHEREAS, it is a condition precedent to the Secured Party's making the Loan or otherwise extending credit to the Debtor under the Loan Documents, that the Debtor execute and deliver to the Secured Party a security agreement in substantially the form hereof; and

WHEREAS, the Debtor wishes to grant security interests in favor of the Secured Party as herein provided;

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**Section 1. Definitions.** All capitalized terms used herein without definitions shall have the respective meanings provided therefor in the Loan Documents. The term "State," as used herein, means the state of the Debtor's organization as identified in the first paragraph of this Agreement. All terms defined in the Uniform Commercial Code of the State and used herein shall have the same definitions herein as specified therein; *provided, however*, that the term "instrument" shall be such term as defined in Article 9 of the Uniform Commercial Code of the State rather than Article 3. The term "Obligations," as used herein, means all of the indebtedness, obligations, and liabilities of the Debtor to the Secured Party, individually or collectively, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereafter arising, including all future advances thereof. An "Event of Default," as used herein, shall have such meaning as described in Section 12.1 of this Agreement.

**Section 2. Grant of Security Interest.** The Debtor hereby grants to the Secured Party, to secure the payment and performance in full of all of the Obligations, a security interest in and so pledges and assigns to the Secured Party nine (9) Park Model RV Units being a 2024 Elevation 3-107 RV Park Model Unit (VIN - 1E9PT30T6RE683062); a 2024 Elevation 3-122 RV Park Model Unit (VIN - 1E9PT30T5RE683098); a 2024 Elevation 5-111 RV Park Model Unit (VIN - 1E9PF39T6RE683167); a 2024 Elevation 3-107 RV Park Model Unit (VIN - 1E9PT30T0RE683168); a 2024 Elevation 3-122 RV Park Model Unit (VIN - 1E9PT30T9RE683170); a 2024 Elevation 5-104 RV Park Model Unit (VIN - 1E9PF38T8RE683172); a 2024 Elevation 5-104 RV Park Model Unit (VIN - 1E9PF38TXRE683173); a 2024 Elevation 5-108 RV Park Model Unit (VIN - 1E9PF30T1RE683171); and a 2024 Elevation 5-109 RV Park Model Unit (VIN - 1E9PF30T3RE683169), together with certain additions and accessories (collectively the "RV Units"), whether now owned or hereafter acquired or arising, and all proceeds and

products thereof and all additions thereto and replacements thereof (all of the same being hereinafter called the "Collateral"). Additionally, to the extent that this loan is financing the purchase of the subject Collateral (the "Purchase Money Collateral"), Debtor hereby grants a purchase money security interest in the Purchase Money Collateral, which Purchase Money Collateral shall specifically include without limitation the items described as follows: the RV Units.

Section 3. Authorization to file Financing Statements and Title Certificate. The Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in with the Maine Department of Motor Vehicles and/or the Maine Secretary of State a title certificate and any financing statements and amendments or addendums thereto, if required, that (a) indicate the Collateral, and (b) contain any other information required by Part 5 of Article 9 of the Uniform Commercial Code of the State for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Debtor is an organization, the type of organization and any organization identification number issued to the Debtor and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. The Debtor agrees to furnish any such information to the Secured Party promptly upon request. The Debtor also ratifies its authorization for the Secured Party to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

**Section 4. Other Actions.** Further to insure the attachment, perfection, and first priority of, and the ability of the Secured Party to enforce, the Secured Party's security interest in the Collateral, the Debtor agrees, in each case at the Debtor's own expense, to take the following actions with respect to the following Collateral:

**4.1. Other Actions as to Any and All Collateral.** The Debtor further agrees to take any other action reasonably requested by the Secured Party to insure the attachment, perfection and first priority of, and the ability of the Secured Party to enforce, the Secured Party's security interest in any and all of the Collateral including, without limitation: (a) executing, delivering and, where appropriate, filing financing statements and amendments or addendums relating thereto under the Uniform Commercial Code, to the extent, if any, that the Debtor's signature thereon is required therefor; (b) causing the Secured Party's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection, or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral; (c) complying with any provision of any statute, regulation, or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection, or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral; (d) obtaining governmental and other third-party consents and approvals, including without limitation any consent of any licensor, lessor, or other person obligated on Collateral; (e) obtaining waivers from mortgagees and landlords in form and substance satisfactory to the Secured Party; and (f) taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable in any relevant Uniform Commercial Code jurisdiction, or by other law as applicable in any foreign jurisdiction.

**Section 5. Representations and Warranties Concerning Debtor's Legal Status.** The Debtor represents and warrants to the Secured Party as follows: (a) the Debtor's exact legal name, type of organization, and jurisdiction of organization is that indicated in the first paragraph of this Agreement, (b) the Debtor's correct organizational identification number is provided on the signature page of this Agreement, or if no such number is provided thereon, Debtor does not have an organizational identification number, and (c) the Debtor's principal place of business or, if more than one, Debtor's chief executive office is located in the State at the address set forth in the first paragraph of this Agreement, unless otherwise indicated as follows: _____ , and if the foregoing is left blank, no such other address exists.

2

**Section 6. <u>Covenants Concerning Debtor's Legal Status</u>.** The Debtor covenants with the Secured Party as follows: (a) without providing at least 30 days prior written notice to the Secured Party, the Debtor will not change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, (b) if the Debtor does not have an organizational identification number and later obtains one, the Debtor shall forthwith notify the Secured Party of such organizational identification number, and (c) the Debtor will not change its type of organization, jurisdiction of organization, or other legal structure.

**Section 7. <u>Representations and Warranties Concerning Collateral, Etc.</u>** The Debtor further represents and warrants to the Secured Party as follows: (a) the Debtor is the owner of or has other rights in the Collateral, free from any adverse lien, security interest, or other encumbrance, except for the security interest created by this Agreement and other liens expressly permitted and specified by the Loan Documents (the "Permitted Liens"), (b) none of the Collateral constitutes, or is the proceeds of, "farm products" as defined in § 9-102(a)(34) of the Uniform Commercial Code of the State, (c) none of the account debtors or other persons obligated on any of the Collateral is a governmental authority subject to the Federal Assignment of Claims Act or like federal, state, or local statute or rule in respect of such Collateral, (d) the Debtor has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state, and local statutes and ordinances dealing with the control, shipment, storage, or disposal of hazardous materials or substances, and (e) all other information set forth on the Loan Documents pertaining to the Collateral is accurate and complete.

**Section 8. <u>Covenants Concerning Collateral, Etc.</u>** The Debtor further covenants with the Secured Party as follows: (a) the Collateral will be kept at Debtor's physical address referenced above within the State, unless the Debtor otherwise notifies the Secured Party in writing; (b) the Debtor will not remove the Collateral from the foregoing  location without providing at least 30 days prior written notice to the Secured Party; (c) except for the security interest herein granted and any Permitted Liens, the Debtor shall be the owner of or have other rights in the Collateral free from any lien, security interest, or other encumbrance, and the Debtor shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to the Secured Party; (d) the Debtor shall not pledge, mortgage, or create, or suffer to exist a security interest in the Collateral in favor of any person other than the Secured Party, except for any Permitted Liens; (e) the Debtor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon; (f) the Debtor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located; (g) the Debtor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement; (h) the Debtor will continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state, and local statutes and ordinances dealing with the control, shipment, storage, or disposal of hazardous materials or substances; and (i) the Debtor will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except for: (1) sales or leases of inventory (and licenses of any general intangibles) in the ordinary course of business, and (2) so long as no Event of Default has occurred and is continuing, sales or other dispositions of obsolescent items of equipment in the ordinary course of business consistent with past practices of the Debtor.

**Section 9. <u>Insurance</u>.**

    **9.1. Maintenance of Insurance.** The Debtor will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as

3

shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas. Such insurance shall be in such minimum amounts that the Debtor will not be deemed a co-insurer under applicable insurance laws, regulations, and policies and otherwise shall be in such amounts, contain such terms, be in such forms, and be for such periods as may be reasonably satisfactory to the Secured Party. In addition, all such insurance shall be payable to the Secured Party as loss payee under a "standard" loss payee clause. Without limiting the foregoing, the Debtor will (i) keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverages and electronic data processing coverage as reasonably required by Secured Party, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to one hundred percent (100%) of the full replacement cost of such property, (ii) maintain all such workers' compensation or similar insurance as may be required by law, and (iii) maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death, or property damage occurring on, in, or about the properties of the Debtor; business interruption insurance; and product liability insurance.

**9.2. Insurance Proceeds.** The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights, if any, of other parties with a prior interest in the property covered thereby, (i) so long as no Default or Event of Default has occurred and is continuing and to the extent that the amount of such proceeds is less than or equal to the amount of the Obligations, be disbursed to the Debtor for direct application by the Debtor solely to the repair or replacement of the Debtor's property so damaged or destroyed and (ii) in all other circumstances, be held by the Secured Party as cash collateral for the Obligations. The Secured Party may, at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as the Secured Party may reasonably prescribe, for direct application by the Debtor solely to the repair or replacement of the Debtor's property so damaged or destroyed, or the Secured Party may apply all or any part of such proceeds to the Obligations.

**9.3. Notice of Cancellation, Etc.** All policies of insurance shall provide for at least thirty (30) days prior written cancellation notice to the Secured Party. In the event of failure by the Debtor to provide and maintain insurance as herein provided, the Secured Party may, at its option, provide such insurance and charge the amount thereof to the Debtor. The Debtor shall furnish the Secured Party with certificates of insurance and policies evidencing compliance with the foregoing insurance provision.

**Section 10. <u>Collateral Protection Expenses; Preservation of Collateral</u>.**

**10.1. Expenses Incurred by Secured Party.** In its discretion, the Secured Party may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, make repairs thereto, and pay any necessary filing fees. The Debtor agrees to reimburse the Secured Party on demand for any and all expenditures so made. The Secured Party shall have no obligation to the Debtor to make any such expenditures, nor shall the making thereof relieve the Debtor of any default.

**10.2. Secured Party's Obligations and Duties.** Anything herein to the contrary notwithstanding, the Debtor shall remain liable under each contract or agreement comprised in the Collateral to be observed or performed by the Debtor thereunder. The Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by the Secured Party of any payment relating to any of the Collateral, nor shall the Secured Party be obligated in any manner to perform any of the obligations of the Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by the Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any

4

performance, or to collect the payment of any amounts which may have been assigned to the Secured Party or to which the Secured Party may be entitled at any time or times. The Secured Party's sole duty with respect to the custody, safe keeping, and physical preservation of the Collateral in its possession, under § 9-207 of the Uniform Commercial Code of the State or otherwise, shall be to deal with such Collateral in the same manner as the Secured Party deals with similar property for its own account.

**Section 11. <u>Securities and Deposits</u>.** The Secured Party may at any time following and during the continuance of a Default and Event of Default, at its option, transfer to itself or any nominee any securities constituting Collateral, receive any income thereon, and hold such income as additional Collateral or apply it to the Obligations. Whether or not any Obligations are due, the Secured Party may following and during the continuance of a Default and Event of Default demand, sue for, collect, or make any settlement or compromise which it deems desirable with respect to the Collateral. Regardless of the adequacy of Collateral or any other security for the Obligations, any deposits or other sums at any time credited by or due from the Secured Party to the Debtor may at any time be applied to or set off against any of the Obligations then due and owing.

**Section 12. <u>Event of Default, Notification to Account Debtors and Other Obligors</u>.**

    **12.1 Events of Default.** The occurrence of any of the following shall, at the option of the secured Party, be an Event of Default under this Agreement: (a) an uncured default in the payment or performance of any Obligations or terms contained in, referred to or secured by this Agreement or any other of the Loan Documents; (b) if any warranty, representation, or statement made or furnished to Secured Party by or on behalf of Debtor in connection with this Agreement or any other Loan Document proves to have been false in any material respect; (c) loss, theft, substantial damage, destruction, sale or encumbrance to or of the Collateral, or the making or suffering of a levy, seizure, or attachment thereon; (d) death, dissolution, termination of existence, insolvency, business failure, failure to pay debts as they become due, bankruptcy, reorganization, appointment of a receiver of any part of the Collateral, assignment for the benefit of creditors, or the commencement of any proceedings under a bankruptcy or insolvency law of, by or against Debtor or any guarantor or surety for Debtor; (e) any event which results in the acceleration of the maturity of the indebtedness of Debtor to others; (f) material impairment to the prospect of payment or performance of a warranty or agreement, or the value of any Collateral, or priority of a security interest in any such Collateral; (g) if the Collateral or any part thereof is located on premises leased to or rented by Debtor, a failure on Debtor's part to pay rent or otherwise abide by the terms of the lease; or (h) transfer of the voting stock of Debtor in whole or part.

    **12.2 Notification.** If an Event of Default shall have occurred and be continuing, the Debtor shall, at the request of the Secured Party, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument, or other Collateral and that payment thereof is to be made directly to the Secured Party or to any financial institution designated by the Secured Party as the Secured Party's agent therefor, and the Secured Party may itself, if an Event of Default shall have occurred and be continuing, without notice to or demand upon the Debtor, so notify account debtors and other persons obligated on Collateral. After the making of such a request or the giving of any such notification, the Debtor shall hold any proceeds of collection of accounts, chattel paper, general intangibles, instruments, and other Collateral received by the Debtor as trustee for the Secured Party without commingling the same with other funds of the Debtor and shall turn the same over to the Secured Party in the identical form received, together with any necessary endorsements or assignments. The Secured Party shall apply the proceeds of collection of accounts, chattel paper, general intangibles, instruments, and other Collateral received by the Secured Party to the Obligations, such proceeds to be immediately entered after final payment in cash or other immediately available funds of the items giving rise to them.

**Section 13. <u>Power of Attorney</u>.**

 **13.1. Appointment and Powers of Secured Party.** The Debtor hereby irrevocably constitutes and appoints the Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of the Debtor or in the Secured Party's own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of the Debtor, without notice to or assent by the Debtor, to do the following:

 (a)  upon the occurrence and during the continuance of an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to, or otherwise deal with any of the Collateral in such manner as is consistent with the Uniform Commercial Code of the State and as fully and completely as though the Secured Party were the absolute owner thereof for all purposes, and to do at the Debtor's expense, at any time, or from time to time, all acts and things which the Secured Party deems necessary to protect, preserve, or realize upon the Collateral and the Secured Party's security interest therein, in order to effect the intent of this Agreement, all as fully and effectively as the Debtor might do, including, without limitation, (i) the filing and prosecuting of registration and transfer applications with the appropriate federal or local agencies or authorities with respect to trademarks, copyrights, and patentable inventions and processes, (ii) upon written notice to the Debtor, the exercise of voting rights with respect to voting securities, which rights may be exercised, if the Secured Party so elects, with a view to causing the liquidation in a commercially reasonable manner of assets of the issuer of any such securities, and (iii) the execution, delivery, and recording, in connection with any sale or other disposition of any Collateral, of the endorsements, assignments, or other instruments of conveyance or transfer with respect to such Collateral; and

 (b)  to the extent that the Debtor's authorization given in Section 3 is not sufficient, to file such financing statements with respect hereto, with or without the Debtor's signature, or a photocopy of this Agreement in substitution for a financing statement, as the Secured Party may deem appropriate and to execute in the Debtor's name such financing statements and amendments thereto and continuation statements which may require the Debtor's signature.

 **13.2. Ratification by Debtor.** To the extent permitted by law, the Debtor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

 **13.3. No Duty on Secured Party.** The powers conferred on the Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. The Secured Party shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Debtor for any act or failure to act, except for the Secured Party's own gross negligence or willful misconduct.

**Section 14. <u>Remedies</u>.** If an Event of Default shall have occurred and be continuing, the Secured Party may, without notice to or demand upon the Debtor, declare this Agreement to be in default, and the Secured Party shall thereafter have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code of the State or of any jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral, and for that purpose the Secured Party may, so far as the Debtor can give authority therefor, enter upon any premises on which the Collateral may be situated and remove

6

the same therefrom. The Secured Party may in its discretion require the Debtor to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of the Debtor's principal office(s) or at such other locations as the Secured Party may reasonably designate. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Secured Party shall give to the Debtor at least five Business Days prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made. The Debtor hereby acknowledges that five Business Days prior written notice of such sale or sales shall be reasonable notice. In addition, the Debtor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of the Secured Party's rights hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights with respect thereto.

**Section 15. <u>Standards for Exercising Remedies.</u>** To the extent that applicable law imposes duties on the Secured Party to exercise remedies in a commercially reasonable manner, the Debtor acknowledges and agrees that it is not commercially unreasonable for the Secured Party (a) to fail to incur expenses reasonably deemed significant by the Secured Party to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third-party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third-party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as the Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure the Secured Party against risks of loss, collection, or disposition of Collateral or to provide to the Secured Party a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Secured Party, to obtain the services of other brokers, investment consultants, and other professionals to assist the Secured Party in the collection or disposition of any of the Collateral. The Debtor acknowledges that the purpose of this Section 15 is to provide nonexhaustive indications of what actions or omissions by the Secured Party would not be commercially unreasonable in the Secured Party's exercise of remedies against the Collateral and that other actions or omissions by the Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this Section15. Without limitation upon the foregoing, nothing contained in this Section 15 shall be construed to grant any rights to the Debtor or to impose any duties on the Secured Party that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 15.

**Section 16. <u>No Waiver by Secured Party, Etc.</u>** The Secured Party shall not be deemed to have waived any of its rights upon or under the Obligations or the Collateral unless such waiver shall be in writing and signed by the Secured Party. No delay or omission on the part of the Secured Party in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion. All rights and remedies of the Secured Party with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively, or concurrently at such time or at such times as the Secured Party deems expedient.

**Section 17. <u>Suretyship Waivers by Debtor</u>.** The Debtor waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon, and all other demands and notices of any description. With respect to both the Obligations and the Collateral, the Debtor assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange, or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising, or adjusting of any thereof, all in such manner and at such time or times as the Secured Party may deem advisable. The Secured Party shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in Section 10.2. The Debtor further waives any and all other suretyship defenses.

**Section 18. <u>Marshalling</u>.** The Secured Party shall not be required to marshal any present or future collateral security (including but not limited to this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, the Debtor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Secured Party's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Debtor hereby irrevocably waives the benefits of all such laws.

**Section 19. <u>Proceeds of Dispositions; Expenses</u>.** The Debtor shall pay to the Secured Party on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Secured Party in protecting, preserving, or enforcing the Secured Party's rights under or in respect of any of the Obligations or any of the Collateral. After deducting all of said expenses, the residue of any proceeds of collection or sale of the Obligations or Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference as the Secured Party may determine or in such order or preference as is provided in the Credit Agreement, proper allowance and provision being made for any Obligations not then due. Upon the final payment and satisfaction in full of all of the Obligations and after making any payments required by §§ 9-608(a)(1)(C) or 9-615(a)(3) of the Uniform Commercial Code of the State, any excess shall be returned to the Debtor, and the Debtor shall remain liable for any deficiency in the payment of the Obligations.

**Section 20. <u>Overdue Amounts</u>.** Until paid, all amounts due and payable by the Debtor hereunder shall be a debt secured by the Collateral and shall bear, whether before or after judgment, interest at the rate of interest for overdue principal set forth in the Loan Documents.

**Section 21. <u>Governing Law; Consent to Jurisdiction</u>.** THIS AGREEMENT IS INTENDED TO TAKE EFFECT AS A SEALED INSTRUMENT AND SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE "STATE". The Debtor agrees that any suit for the enforcement of this Agreement may be brought in the courts of the State or any federal court sitting therein and consents to the nonexclusive jurisdiction of such court and to service of process in any such suit being made upon the Debtor by mail at the address set forth in the first paragraph of this Agreement, or such other address as may be provided in writing by the Debtor to the Secured Party. The Debtor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

8

**Section 22. <u>Miscellaneous</u>.** The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof. This Agreement and all rights and obligations hereunder shall be binding upon the Debtor and its respective successors and assigns, and shall inure to the benefit of the Secured Party and its successors and assigns. If any term of this Agreement shall be held to be invalid, illegal, or unenforceable, the validity of all other terms hereof shall in no way be affected thereby, and this Agreement shall be construed and be enforceable as if such invalid, illegal, or unenforceable term had not been included herein. The Debtor acknowledges receipt of a copy of this Agreement.

IN WITNESS WHEREOF, intending to be legally bound, the Debtor has caused this Agreement to be duly executed as of this 1st day of April, 2024.

_____
Witness

_____
Witness

STATE OF MAINE
COUNTY OF YORK

SANDY PINES, LLC
Charter # 20180802DC

By _____
Timothy Harrington
Its: Operating Manager

SACO AND BIDDEFORD SAVINGS INSTITUTION

By _____
Eric G. Doyon
Its: Senior Vice President

Before me, on this 1st day of April, 2024, personally appeared Timothy Harrington, Operating Manager of Sandy Pines, LLC, and acknowledged the foregoing to be his free act and deed, in his said capacity, and the free act and deed of said Sandy Pines, LLC.

_____
Notary Public
Print Name:
My Commission Expires:

**BRYAN J. CHRISTOFORO**
NOTARY PUBLIC
State of Maine
My Commission Expires
April 12, 2025

9

# EXHIBIT B

## GUARANTY

For valuable consideration, the receipt of which is hereby acknowledged, and in consideration of SACO AND BIDDEFORD SAVINGS INSTITUTION (the "Bank") now or in the future making advances or otherwise extending or continuing credit to SANDY PINES, LLC "Borrower"), however such advances or credit may be made or evidenced, the Undersigned unconditionally guaranties, jointly and severally, to Bank, its successors and assigns, full and prompt payment when due of all such advances, of all notes or other obligations made by or assumed by Borrower or endorsed by Borrower and discounted by Bank and of any and all other liabilities of Borrower to Bank, now existing or hereafter arising, howsoever created or evidenced, and all renewals, extensions or modifications thereof or substitutions therefor (collectively the "Obligations") together with all costs and expenses of collection thereof and of enforcement of this Guaranty, including reasonable attorneys' fees.

Notice of acceptance of this Guaranty and of any action taken by Bank from time to time under this Guaranty or the Obligations is hereby waived, and this Guaranty shall operate as a continuing and absolute Guaranty covering all Obligations of Borrower to Bank arising or contracted for prior to the expiration of five (5) days after the receipt by Bank of written notice of the termination of this Guaranty by the Undersigned, but such termination shall not affect any liability hereunder then existing, then due or thereafter to become due, nor affect the continuing liabilities of any other guarantor.

Upon any default by Borrower, the liability of the Undersigned shall be effective immediately, without demand, presentment, protest or notice of any kind, all of which are hereby waived, without any action, proceeding or suit, whether against Borrower, any security for the Obligations, or any other party liable for the Obligations, without exhausting any other remedies, and without further steps to be taken or further conditions to be performed by Bank. Failure of Bank to make any demand or otherwise to proceed against the Undersigned or any other person liable on the Obligations in respect to any default by Borrower shall not constitute a waiver of Bank's right to proceed in respect to any or all other defaults by Borrower.

The liability of the Undersigned shall not be terminated or otherwise affected or impaired by the Bank from time to time in granting one or more extensions of time, renewals or other indulgences to Borrower, or by the Bank heretofore, now, or hereafter acquiring, releasing or in any way modifying any liability of any other person or persons or any security in whatever form for any or all of the Obligations, whether or not notice thereof shall have been or be given to the Undersigned, or by any failure or inability or neglect on the part of Bank from time to time to take any action with respect to, or to obtain, perfect or realize upon any security, rights, endorsements or guaranties which Bank may now or hereafter hold with respect to any of the Obligations, or because of any fraudulent, illegal, improper or invalid acts of Borrower, or because any Obligations are or may become barred or otherwise unenforceable, or be altered or reduced in any bankruptcy, insolvency, or equitable proceeding affecting the Obligations, the

Borrower, or the Borrower's assets, or because of the failure of Bank to verify any information or to examine the books of Borrower or to discovery any irregularities.

Until all Obligations of the Borrower to the Bank, whether or not guaranteed by the Undersigned, are paid in full, the Undersigned waives any right to exoneration by the Borrower, or to contribution from any co-surety or security for any of the Obligations, defers any right of subrogation and defers any right to reimbursement from the Borrower. Prior to payment in full of the Obligations, the Undersigned hereby waives the right to specific notice of default as to any particular Obligation, the right to compel the Bank to first proceed against the Borrower or any other guarantor or surety for the Obligations, or to proceed against security received from the Borrower and the right to direct application of payments or the proceeds of any security.

This Guaranty shall be binding upon the personal representatives, heirs and assigns of the Undersigned; and the death of the Undersigned shall not relieve him from any liability or obligation accruing prior to his death, nor accruing prior to the expiration of five (5) days after the receipt by Bank of notice of his death. The Undersigned hereby submits to the jurisdiction of the courts of the United States of America and the State of Maine in connection with any suits or proceedings arising hereunder.

If all Obligations of the Borrower to the Bank are at any time hereafter paid in full and thereafter Borrower again becomes indebted to the Bank, the provisions of this agreement shall apply to said new Obligations unless before the same is incurred the Undersigned notifies the Bank in writing of the termination of this Guaranty.

If, at any time, all or part of payment of the Obligations made by Borrower or the Undersigned is rescinded or otherwise must be returned by Bank for any reason whatsoever (including, but not limited to, the insolvency, bankruptcy or reorganization of Borrower or the Undersigned), this Guaranty shall remain in full force and effect, or shall be reinstated, as the case may be, as to the Obligations which were satisfied by the payment to be rescinded or returned, all as though such payment had not been made.

This instrument is intended to take effect as a sealed instrument and shall not become effective until received by Bank. This instrument and all rights and remedies of the parties shall be construed and interpreted under the laws of the State of Maine.

This Guaranty may be secured by certain security documentation now or hereafter held by the Bank whether or not such security is described below. The Undersigned hereby grants to the Bank, as security for the performance of this Guaranty, a continuing lien on and security interest in all securities or other property of the Undersigned now or hereafter held by the Bank and in all deposits and other sums credited by or due from the Bank to the Undersigned or subject to withdrawal by the Undersigned. Regardless of the adequacy of any collateral, the Bank may at any time and without notice to the Undersigned set off the whole or any portion of any such deposits and other sums, whether or not any other person or persons could also withdraw money therefrom.

2

IN WITNESS WHEREOF, the Undersigned have duly executed this Guaranty on April 1, 2024 at Saco, Maine.

_____                      _____
Witness                                                                          Timothy Harrington