**Exhibit A**
**Successful Bid**

## CAMPGROUND PURCHASE AND SALE AGREEMENT

**THIS CAMPGROUND PURCHASE AND SALE AGREEMENT** is made and entered into as of _____May 26_____, 2026 (the "**Effective Date**") by and between ___Streamside Signature Acquisitions, LLC___, a ___Wyoming, limited liability company___, as purchaser ("**Purchaser**"), and SANDY PINES, LLC, a Maine limited liability company, as seller ("**Seller**", and together with Purchaser, each a "**Party**" and, collectively, the "**Parties**").

### WITNESSETH

**WHEREAS,** Seller is the owner and operator of the campground, general store, and related assets known as "Sandy Pines Campground" generally located at 277 Mills Road, Kennebunkport, ME (the "**Business**");

**WHEREAS**, Seller filed a voluntary petition for relief commencing a case (the "**Chapter 11 Case**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Maine (the "**Bankruptcy Court**") on February 24, 2026;

**WHEREAS**, Seller continues in possession of its assets and is authorized under the Bankruptcy Code to continue the operation of the Business as debtor-in-possession; and

**WHEREAS**, Seller wishes to sell and assign to Purchaser, and Purchaser wishes to purchase and assume from Seller, the Property (defined below) pursuant to Sections 105, 363, and 365 of the Bankruptcy Code (each as applicable).

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained and other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, Purchaser and Seller, intending to be legally bound (subject to entry of the Sale Order (defined below)), hereby agree as follows:

### ARTICLE I
### DEFINITIONS

**1.1    Capitalized Terms**.  For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Agreement**" means this Campground Purchase and Sale Agreement, together with all of the schedules and exhibits attached hereto, as it or they may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

"**Air Rights**" means all air rights, including, without limitation, all right, title and interest in and to surplus or unused buildable development rights; excess floor area rights; and other transferable development rights belonging to or useable with respect to the ownership, operation, expansion, and control of the Business.

Docusign Envelope ID: 3814B90K9864-812R-8133870603F863F

"**Assumed Contract**" means any contract, agreement, lease, or license that is designated by Purchaser as an "assumed contract," in its sole discretion, and (i) is listed on Schedule 2.4, as same may be amended from time to time at the option of Purchaser until the date that is ten (10) Business Days prior to the commencement of the Sale Hearing to add any assumed contract thereto; (ii) is subject to the approval of the Bankruptcy Court of the assignment and assumption free and clear of Encumbrances; and (iii) is actually assumed by Seller and assigned to Purchaser at Closing.

"**Assumed Liabilities**" shall have the meaning provided in Section 2.4.

"**Backup Bidder**" shall mean the second highest bidder as designated by the Sale Order who shall be obligated to close if the Successful Bidder fails to close.

"**Bankruptcy Code**" shall have the meaning in the recitals hereto.

"**Bankruptcy Court**" shall have the meaning in the recitals hereto.

"**Bid Procedures and Sale Motion**" means that motion filed by Seller in the Chapter 11 Case at Docket Number 98 seeking entry of the Bid Procedures Order and the Sale Order.

"**Bid Procedures Order**" means the Order Approving Bid Procedures and Related Relief entered by the Bankruptcy Court on April 6, 2026, at Docket Number 120 in the Chapter 11 Case.

"**Bookings**" means all contracts or reservations for the use of guest rooms, campsites or glamping sites, Whimsical Retreats, cottages, or other amenities related to the Business.

"**Books and Records**" means, collectively, the following: (a) all financial statements of the Seller and all correspondence sent by the Seller to any applicable Governmental Authority and/or to the owner or holder of any Encumbrance with respect to the Seller and/or the Property and/or received by the Seller from any applicable Governmental Authority and/or the owner or holder of any Encumbrance with respect to the Seller and/or the Property, and all accounting, financial, Tax and other books, records and/or files relating to the ownership, operation, maintenance, repair, use and/or occupancy of the Business; and (b) all structural reviews, environmental assessments or audits, architectural drawings and engineering, geophysical, soils, seismic, geologic, environmental (including with respect to the impact of materials used in the construction or renovation of the Improvements) and other reports, studies, plans, blue prints, specifications and certificates pertaining to the Property.

"**Brokers**" means any broker(s) retained by Seller pursuant to an order of the Bankruptcy Court under Section 327 of the Bankruptcy Code.

"**Business Day**" means any day other than a Saturday, Sunday, or any other day on which banking institutions in the State of Maine are authorized by law or executive action to close.

"**Chapter 11 Case**" shall have the meaning in the recitals hereto.

"**Closing**" means the actual closing of the transactions contemplated by this Agreement.

2

"**<u>Closing Date</u>**" means the day on which the Closing occurs.

"**<u>Closing Documents</u>**" has the meaning given such term in <u>Section 5.2</u>.

"**<u>Closing Proration Time</u>**" means 12:01 a.m. local time on the Closing Date.

"**<u>Customer Vouchers</u>**" means, collectively, all gift cards, gift certificates, coupons, or other similar instruments or vouchers that entitle the holder or bearer thereof to a credit (whether in a specified monetary amount or for a specified item, such as a room night or meal) to be applied against the usual charge for rooms, sites, facilities, and/or other goods and services provided in the Business.

"**<u>Dollars</u>**" **or** "**<u>$</u>**" means United States dollars.

"**<u>Encumbrance</u>**" means any interest, pledge, Lien, mortgage, security interest, judgment, demand, restriction, charge of any kind or nature, claim (as and to the full extent that term is defined in Bankruptcy Code Section 101(5) of the Bankruptcy Code), obligation, option, right, or restriction whether imposed by agreement, understanding, law, equity or otherwise (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated) in or with respect to the Business or the Property or against Seller.

"**<u>Environmental Laws</u>**" means any Legal Requirements relating to pollution, the protection or regulation or human health or safety, natural resources or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste into the environment (including ambient air, surface water, ground water or land or soil).

"**<u>Escrow Agent</u>**" means Monument Title.

"**<u>Excluded Assets</u>**" shall have the meaning provided in <u>Section 2.5</u> hereto.

"**<u>Extension Deposit</u>**" means the additional, non-refundable deposit of Purchaser, equal to 10.00% of the Purchase Price, which Purchaser may make in accordance with <u>Section 2.2</u>. The Extension Deposit shall be in addition to the Initial Deposit.

"**<u>FF&E</u>**" means, collectively, all furniture, fixtures and equipment related to the ownership, operation, maintenance, repair, use and/or occupancy of the Business and in possession, custody or control of the Seller as of the date hereof, including all heating, lighting, plumbing, drainage, electrical, air conditioning, and other mechanical fixtures and equipment and systems, elevators, escalators and related motors and electrical equipment and systems, all shelving and partitions, and all cars, trucks, other vehicles, vessels and watercraft, machinery, signage, appliances, lobby furniture, carpeting, television sets, office furniture and equipment such as safes, computers, telephone systems, camping equipment, and decorative lighting. The aforementioned items include, without limitation, those items listed on the exhibit attached hereto as the <u>FF&E Exhibit</u> at <u>Exhibit E</u>.

"**<u>Governmental Authority</u>**" means any federal, state or local government or other political subdivision thereof, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question.

"**<u>Hazardous Materials</u>**" means, collectively, any substances or materials (a) which are hazardous, toxic, infectious, explosive, corrosive, flammable, radioactive, carcinogenic, or mutagenic, (b) which are now or hereafter classified as or considered to be hazardous or toxic or the presence of which requires investigation or remediation under any Environmental Laws or (c) which are or contain polychlorinated biphenyls, asbestos, radioactive materials, lead-based paint, mold in amounts and types that are hazardous to human health, urea formaldehyde foam insulation, or petroleum.

"**<u>Improvements</u>**" means, collectively, the building(s) in which the Business is operated and all of the other buildings, structures (surface and subsurface), installations and improvements located on the Land, together with all of the fixtures and other property affixed thereto or integrated therein.

"**<u>Initial Deposit</u>**" means seven hundred twelve thousand ($ 712,500 ), together with all interest earned thereon (if any), which shall be an amount equal to 5.00% of the Purchase Price in accordance with the Bid Procedures Order, which shall be non-refundable except as provided in Sections 8.1 and 9.1 below, <u>provided</u>, <u>however</u>, that the Initial Deposit of any bidder other than the Successful Bidder and the Backup Bidder shall be refunded within 5 business days of the Sale Hearing, and <u>provided</u> <u>further</u> that the Initial Deposit of the Backup Bidder shall be refunded within 5 business days of the Closing by the Successful Bidder.

"**<u>Intangible Property</u>**" means, collectively, the following: (a) the Bookings; (b) the Licenses and Permits; (e) all phone numbers and fax numbers related to the Business; (c) all other intangible property arising from or used in connection with the construction, development, ownership, operation, maintenance, repair, use and/or occupancy of the Property (including any construction warranties, equipment warranties and other guarantees or warranties related thereto), other than any warranties, representations and guarantees pertaining to any Excluded Assets; (d) all U.S. and foreign trademarks, service marks, certification marks, collective marks and trade names, trade secrets, confidential information, know how, show how, trade dress, websites, e-mail addresses, internet domain names; and all registered trademarks and logos used in connection with the operation of the Business; and (e) all customer lists, technology, source code, goodwill and other items of intangible or intellectual property, in each case except as included as an Excluded Asset.

"**<u>Inventories and Supplies</u>**" means, collectively, the following: all food, beverage and merchandise inventories held for sale in connection with the Business; all engineering, maintenance, housekeeping and laundry supplies and materials, including all tools, mechanical stores, cleaning materials, fuel, soap and light bulbs; all chinaware, glassware, silverware, utensils, three par linens and other bar or restaurant supplies; all uniforms; all stationary and paper supplies, accounting supplies and other consumable inventories or supplies of any kind (whether or not intended for sale or use) in connection with the ownership, operation, maintenance, repair, use

4

and/or occupancy of the Business, in each case whether partially used, unused, or held in reserve storage for future use, together with any replacements thereof.

"**Land**" means, collectively, that certain parcel or those certain parcels of land as more particularly described on Schedule 1.1, together with all and singular the rights and appurtenances pertaining to such property, including, without limitation: (i) easements and rights-of-way, (ii) licenses and other privileges, (iii) rights in and to land underlying adjacent highways, streets and other public rights-of-way and rights of access thereto, (iv) rights in and to strips and gores of land within or adjoining any such parcel, (v) Air Rights, excess floor area rights and other transferable development rights belonging to or useable with respect to any such parcel, (vi) rights to utility connections and hook-ups, (vii) water rights, (viii) riparian rights, and (ix) any other rights of whatsoever kind, type, nature, description or characterization which Seller may have in or with respect to land adjoining any such parcel.

"**Legal Requirements**" means, collectively, all national, federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities or any arbitral award affecting Seller, the Seller Employees, the Property or any part thereof, or the construction, development, ownership, operation, maintenance, repair, use and/or occupancy of the Property, or any part thereof, whether now or hereafter enacted and in force, and all Licenses and Permits relating thereto, and all covenants, agreements, restrictions and Encumbrances contained in any instruments, whether or not of record and whether or not a Permitted Encumbrance, at any time in force affecting the Property or any part thereof.

"**Licenses and Permits**" means all transferable licenses, permits, approvals, authorizations, consents, certificates, permissions and/or registrations granted or issued by any Governmental Authority which are held by or on behalf of Seller (including, without limitation, all licenses and permits related to the construction, use or occupancy of the Property or the Business) in connection with the ownership, operation, maintenance, repair, use and/or occupancy of the Business.

"**Lien**" means any mortgage, deed of trust, mechanic's lien, tax lien or other consensual or non-consensual monetary lien encumbering the Property which can be cured or otherwise removed from title by the payment of a specified amount of money; provided, however, a lien for real estate taxes not yet due and payable or due and payable but not yet delinquent shall not be considered a Lien.

"**Loss**" or "**Losses**" means, collectively, any loss, liability, demand, claim, action, cause of action, cost, damage, deficiency, tax, penalty, fine or expense, whether or not arising out of third party claims (including interest, penalties, reasonable attorneys' fees and expenses in respect of such claims, court costs and all amounts paid in investigation, defense or settlement of any of the foregoing).

"**Material Adverse Effect**" means a materially adverse effect on (a) the business, assets, liabilities, condition (financial or otherwise), results of operations or business prospects of Seller or the Business, (b) the ability of Seller to perform its obligations under this Agreement or any of the Closing Documents, (c) the validity or enforceability of this Agreement or any of the Closing

Documents, or (d) the rights and remedies of Purchaser under this Agreement or any of the Closing Documents.

"**Party**" or "**Parties**" have the meanings given such terms in the first paragraph of this Agreement.

"**Permitted Encumbrances**" means, collectively, (a) Liens for real estate taxes not yet due and payable or due and payable but not yet delinquent and (b) such other non-monetary encumbrances of record with respect to the Property which are identified in the Title Commitment or shown on the Survey but are otherwise deemed to be Permitted Encumbrances.

"**Person**" or "**person**" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, real estate investment trust, unincorporated association or other business entity, any international, foreign, federal, state, county or municipal government or any agency, board, bureau or department thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" means, collectively, the following:  (a) the Books and Records; (b) the FF&E; and (c) the Inventories and Supplies.

"**Proceeding**" means any litigation, arbitration, claim, action, suit, audit, proceeding or investigation.

"**Property**" means, collectively, the Real Property, the Personal Property, the Whimsical Retreats, and the Intangible Property.

"**Purchase Price**" mean Fourteen million two hundred fifty thousand and 00/100 Dollars ($ 14,250,000.00 ), subject to any adjustments as expressly provided in this Agreement, which may be increased by Addendum 1, the escalation clause.

"**Purchaser**" has the meaning given such term in the first paragraph of this Agreement.

"**Purchaser Closing Documents**" means those Closing Documents to be executed and delivered by Purchaser under this Agreement.

"**Purchaser Parties**" means, collectively, Purchaser and each of its respective officers, directors, representatives, and permitted assigns.

"**Real Property**" means, collectively, the Land and the Improvements.

"**Sale Hearing**" means the hearing held by the Bankruptcy Court to consider the sale of the Property as set forth in the Bid Procedures Order.

"**Sale Order**" means the order of the Bankruptcy Court authorizing Seller to complete the transactions set forth in this Agreement.

"**Seller**" has the meaning given such term in the first paragraph of this Agreement.

"**Seller Closing Documents**" means those Closing Documents to be executed and delivered by Seller under this Agreement.

"**Seller Employee Benefit Arrangement**" means any employment, consulting, severance or other similar contract, arrangement or policy and each plan, arrangement (written or oral), program, agreement or commitment providing for insurance coverage (including any self-insured arrangements), workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, life, health, disability or accident benefits (including, without limitation, any "voluntary employees' beneficiary association" as defined in Section 501(c)(9) of the Tax Code providing for the same or other benefits) or for deferred compensation, profit-sharing bonuses, stock options, stock appreciation rights, stock purchases or other forms of incentive or equity compensation or post-retirement insurance, compensation or benefits which (is entered into, maintained, contributed to or required to be contributed to, as the case may be, by Seller, and covers any employees, former employees, directors or former directors of Seller.

"**Seller Employees**" means, collectively, all individuals who are, or were, employed at the Business as of the day immediately preceding the Closing Date.

"**Seller's knowledge**" means the knowledge of any director, officer, manager, or partner of Seller after reasonable inquiry.

"**Settlement Statement**" means a "Settlement Statement" in a form and substance reasonably satisfactory to Purchaser and Seller showing (among other things) the Purchase Price and any adjustments or apportionments provided for under this Agreement.

"**Successful Bidder**" shall mean the winning bidder as designated by the Sale Order.

"**Survey**" means an ALTA survey of the Real Property prepared by a surveyor licensed in the State of Maine.

"**Surviving Obligations**" means, collectively, those obligations and liabilities of Purchaser and/or Seller that expressly survive the Closing and/or any earlier termination of this Agreement.

"**Tax**" means any federal, state, municipal, local, foreign or other taxes, imposts, rates, levies, duties, customs, contributions, assessments and other charges, including income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, premium, excise, margins, business organization, natural resources, severance, stamp, occupation, windfall profits, capital, net worth, environmental, customs, duties, real property, personal property, ad valorem, capital stock, escheat, social security (or similar), retirement, unemployment, welfare, disability, workers' compensation, payroll, severance, license, employee, withholding or other tax, of any kind whatsoever, including any interest, penalties or additions to tax in respect of the foregoing (whether disputed or not) and any liability in respect of any of the foregoing payable by reason of contract, assumption, transferee or successor liability, operation of law, combined or consolidated reporting or otherwise.

"**Tax Code**" means the Internal Revenue Code of 1986 and the regulations promulgated thereunder, as it and they may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Title Commitment**" means a preliminary title commitment issued by the Title Company for an ALTA extended owner's policy of title insurance with respect to the Real Property, together with legible copies of all instruments and documents referred to therein as exceptions to title.

"**Title Company**" means First American Title Company.

"**Title Policy**" means an ALTA extended owner's title insurance policy issued by the Title Company ensuring that fee simple title to the Real Property is vested in Purchaser, subject only to the Permitted Encumbrances, with such endorsements as shall be required by Purchaser and otherwise in form and substance consistent with the Title Commitment.

"**Whimsical Retreats**" means those certain themed park model retreats owed by Seller and rented as part of the Business.

**1.2**   **Principles of Construction**.  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  Unless otherwise specified, (a) all uses of the word "including" means "including, without limitation" unless the context shall indicate otherwise, (b) the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement and (c) all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

**ARTICLE II**
**PURCHASE AND SALE; CLOSING**

**2.1**   **Purchase and Sale**.  In consideration of the payment of the Purchase Price by Purchaser to Seller and for other good and valuable consideration, subject to the entry of the Sale Order, Seller hereby agrees to sell the Property to Purchaser, and Purchaser hereby agrees to purchase the Property from Seller, subject to and in accordance with the terms and conditions contained in the Agreement and in the Sale Order.

**2.2**   **Closing Date**.  The purchase and sale of the Property shall be consummated at the Closing which shall be held through an escrow established at the offices of the Escrow Agent on the Closing Date, which date shall occur not later than five (5) Business Days after the Sale Hearing (the "**Outside Closing Date**"), provided, however, that Purchaser may pay the non-refundable Extension Deposit prior to the Outside Closing Date in exchange for a one-time, thirty (30) day extension of the Outside Closing Date.  Seller shall have no obligation to accept the Extension Deposit and grant any extension of the Outside Closing Date. The Purchase Price is subject to Addendum 1.

**2.3**   **Purchase Price.**

**(a)**   **Payment of Purchase Price.**  The Purchase Price shall be paid by Purchaser as follows:

(i)   On or before May 29, 2026, Purchaser shall deposit the Initial Deposit into escrow with the Escrow Agent by wire transfer of immediately available funds.

8

(ii)     On the Closing Date, Purchaser shall deposit the balance of the Purchase Price (subject to all adjustments and credits provided for herein) into escrow with the Escrow Agent by wire transfer of immediately available funds.

**(b)**     **Allocation of Purchase Price.**   The Purchase Price shall be allocated as shown on Schedule 2.3(b) attached hereto and made a part hereof, provided that nothing in Schedule 2.3(b) shall be binding on Seller or on any creditor of Seller for purposes of distribution of the Purchase Price, and allocation of the Purchase Price shall be determined by agreement of the Seller and the applicable creditors or by order the Bankruptcy Court.

**(c)**     **Disbursement of Purchase Price.**   Upon satisfaction of all of the conditions precedent to Purchaser's obligation to proceed to Closing hereunder, Purchaser shall authorize and instruct the Escrow Agent to release and disburse the Purchase Price, adjusted as provided for herein, to Seller (and such other parties, if any, that may be authorized by the Sale Order).

**2.4**     **Assumed Contracts and Assumption of Liabilities**.  Upon the terms and subject to the conditions and provisions contained herein and in the Sale Order, Purchaser shall assume and become responsible for all cure amounts associated with any Assumed Contracts, as ordered by the Bankruptcy Court, together with liabilities arising under the Assumed Contracts (collectively, the "**Assumed Liabilities**"), effective as of the Closing.  The Sale Order shall provide for the assumption and assignment of the Assumed Contracts under Section 365 of the Bankruptcy Code.  Purchaser and/or Seller may file amended, supplemental, or additional pleadings, if required, to address additions or deletions to Schedule 2.4 made pursuant to the definition of Assumed Contracts.  To permit the assumption and assignment of any of the Assumed Contracts to Purchaser pursuant to this Agreement, Purchaser hereby agrees to (i) pay in cash at Closing, in addition to the Purchase Price, any associated cure amounts required under the Bankruptcy Code, the Sale Order, and any other order of the Bankruptcy Court, and (ii) to provide adequate assurance of future performance under the Bankruptcy Code with respect to such Assumed Contracts.  Except with respect to Assumed Liabilities, Purchaser shall not assume any liability or obligation for any Encumbrance, and, except as otherwise provided herein and to the extent permitted by the Bankruptcy Code, the Property shall be sold and conveyed to Purchaser free and clear of all Encumbrances whatsoever.  Any cure payment and adequate assurance provided by Purchaser shall not reduce the Purchase Price.

**2.5**     **Excluded Assets.** Notwithstanding anything to the contrary contained in this Agreement, the Property conveyed to Seller **shall not** include all of the following (collectively the "**Excluded Assets**"):

**(a)**     All cash and cash equivalents (including accounts receivable) of Seller;

**(b)**     insurance policies, premium refunds, and proceeds of insurance and associated claims (provided that, as to any insurance proceeds received post-petition on account of damage to the Property, at Purchaser's option, Seller shall either apply said proceeds toward the repair of the Property or turn over such insurance proceeds to Purchaser at Closing);

9

      **(c)**     rights and obligations under contracts, agreements, leases or licenses of Seller which do not constitute Assumed Contracts hereunder;

      **(d)**     all rights to or claims for refunds or rebates of Taxes for any period ending on or prior to the Closing Date, and the benefit of net operating losses, loss carryforwards, carrybacks, or other credits of Seller relating to any such period;

      **(e)**     all employee benefit plans and trusts or other assets attributable thereto;

      **(f)**     (i) the corporate seals, organizational documents, minute books, stock books, tax returns or other records that Seller is required by applicable law to retain or that Seller reasonably determines is necessary or advisable to retain, provided that Purchaser shall have the right to make copies of any portions of such items that relate to the Business or the Property; (ii) all employee-related or employee benefit-related files or records; and (iii) any other books and records related to employees which Seller is prohibited from disclosing or transferring to Purchaser under applicable law and are required by applicable law to retain;

      **(g)**     the rights which accrue or will accrue to Seller, under this Agreement, any other agreement, document or instrument entered into by Seller in connection with this Agreement or in connection with the transactions contemplated by this Agreement; and

      **(h)**     all causes of action, judgments, claims, counterclaims, demands, rights of recovery or set-off of whatever nature, condemnation awards, including, without limitation, avoidance actions arising under 11 U.S.C. §§ 544-551.

    **2.6**     **Duties of Escrow Agent.**

      **(a)**     **Holding of Deposit.** The Escrow Agent shall hold the Initial Deposit and the Extension Deposit (as applicable) in one or more interest-bearing accounts and shall pay the Initial Deposit and Extension Deposit (as applicable) to the party or parties entitled thereto in accordance with the terms of this Agreement.

      **(b)**     **Disputes**. If there is ever a dispute between the parties with respect to the disposition of the Initial Deposit, Extension Deposit, or the balance of the Purchase Price, then any such dispute shall be subject to the exclusive jurisdiction of the Bankruptcy Court, with the Parties consenting to entry of a final order by the Bankruptcy Court on such matters.

      **(c)**     **Survival.** The terms and conditions of this Section 2.6 shall survive Closing or any earlier termination of this Agreement.

**ARTICLE III**
**DILIGENCE AND TITLE AND SURVEY MATTERS**

    **3.1**     **Property Diligence**. From and after the Effective Date until the Closing or the earlier termination of this Agreement, Seller shall permit the Purchaser Parties to inspect the Property and to perform such other inspections and investigations with respect to the Property and the operation of the Business as Purchaser deems reasonably necessary. Purchaser shall coordinate such inspections, investigations, examinations and meetings with Seller and shall provide Seller

10

with notice (which notice shall be by email to Justin Grimes at justin@atlantichospitality.net) not less than forty-eight (48) hours in advance. Purchaser shall use commercially reasonable efforts to cause any such inspections or investigations to be performed in a manner so as not to unreasonably interfere with the operations of the Business. Purchaser shall indemnify, defend and hold harmless Seller and its estate from and against any and all Losses which Seller or its estate suffers as a result of any entry onto the Property by any Purchaser Party, except to the extent that any such Loss arises out of any act or omission of Seller or the mere discovery of any pre-existing condition at the Property. For the avoidance of doubt, the results of Purchaser's due diligence shall not be grounds for Purchaser to terminate this Agreement.

**3.2** **Title Commitment and Survey.** Promptly following the Effective Date, Purchaser may order (i) the Title Commitment from the Title Company and direct the Title Company to deliver a copy of the Title Commitment to Purchaser and Seller and (ii) the Survey, if any, and shall direct the surveyor to deliver a copy of the Survey to Purchaser and Seller, provided that failure to obtain a Title Commitment and/or Survey before the Outside Closing Date shall not be grounds for Purchaser to terminate this Agreement.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES**

**4.1** **Seller's Representations and Warranties**. To induce Purchaser to enter into this Agreement, Seller represents and warrants to Purchaser as follows:

**(a)** **Corporate Matters**. Seller is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation and in the State of Maine. Subject to the entry of the Sale Order, Seller has all requisite power and authority and all requisite authorizations to own its properties and conduct its business as currently conducted and to execute, deliver and perform its obligations under this Agreement and the Seller Closing Documents to which it is a party.

**(b)** **Binding Obligations**. Subject to the entry of the Sale Order (solely as to Seller), this Agreement constitutes, and each Seller Closing Document constitutes or will constitute, the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

**(c)** **No Conflicts**. The execution, delivery and performance by Seller of this Agreement do not, and as to each Seller Closing Document, do not or will not (except as to the Sale Order), (i) contravene the terms of any of Seller's governing documents; or (ii) conflict with or result in any violation, breach or contravention of, or the creation of any Lien or Encumbrance under, or require any payment to be made under any contractual obligation to which Seller is a party or otherwise affecting Seller or the Property or any Legal Requirement or Permitted Encumbrance.

**(d)** **No Litigation**. Except as disclosed on Schedule 4.1 (d), other than the Chapter 11 Case, there is no Proceeding pending or, to Seller's knowledge, threatened against Seller that (i) may restrain the entry of Seller into or the performance of, enforcement of, or

11

compliance with any of its obligations under this Agreement or any Seller Closing Document or (ii) if determined adversely, could result in a lien or encumbrance or taking of any of the Property.

(e) **Compliance With Licenses and Permits, Legal Requirements and Permitted Encumbrances**.  A true, correct and complete list of all Licenses and Permits needed to use, occupy and operate the Business and/or the Property as currently used, occupied and operated is set forth on Schedule 4.1(e).  To Seller's knowledge, Seller has not received any other written notice alleging any violation by it, the Property or the operations of the Business of any Legal Requirement, Licenses and Permits, or Permitted Encumbrances.

(f) **Hazardous Materials and Environmental Compliance**.  To Seller's knowledge, Seller has delivered to Purchaser true, correct and complete copies of all engineering and environmental reports and studies with respect to the Property and the operation of the Business that are in Seller's possession or control.  Except as disclosed in the environmental reports and studies so delivered to Purchaser, neither Seller nor, to Seller's knowledge, any tenant or other occupant or user of the Property, or any portion thereof, has stored (or engaged in the business of storing) in violation of any applicable Environmental Law, or has disposed of or released or caused the release or disposal of, any Hazardous Materials in, on, under or about the Property.

(g) **Title to Personal Property**.  Seller is the lawful owner of all the Personal Property and the Intangible Property free from any and all rights and claims of others (except for such rights and claims that will be addressed in the Sale Order).

(h) **Employment Contracts; Labor Matters.**  Seller has provided or made available to Purchaser a list of all Seller Employees and the annual salary, benefit entitlements (if any) and other compensation paid to them or accrued by them as of the Closing.

(i) **Not a Foreign Person.**  Seller is not a "foreign person" within the meaning of Section 1445 of the Tax Code.

4.2 **Purchaser's Representations and Warranties**.  To induce Seller to enter into this Agreement, Purchaser represents and warrants to Seller as follows:

(a) **Corporate Matters**.  Purchaser is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation.  Purchaser has all requisite power and authority and all requisite authorizations to own its properties and conduct its business as currently conducted and to execute, deliver and perform its obligations under this Agreement and the Purchaser Closing Documents.  Purchaser has taken all necessary action to authorize the execution, delivery and performance of this Agreement and each Purchaser Closing Document.  This Agreement is, and each Purchaser Closing Document is or will be, duly executed and delivered by Purchaser.

(b) **Binding Obligations.**  This Agreement constitutes, and each Purchaser Closing Document constitutes or will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Seller in accordance with its terms, subject only to applicable bankruptcy, insolvency and similar laws and equitable principles affecting rights of creditors generally.

(c)      **Bid Procedures Order Representations and Covenants**: The following representations and convents set forth in the Bid Procedures Order are true and correct:

(i)      **Disclosure of Identity of and Contact Information**: Purchaser has fully disclosed to Seller the identity of each entity (including any equity owners, sponsors, or co-investors) that will be bidding for or purchasing the Property or otherwise directly or indirectly participating in connection with such bid, as well as contact information for the decision-maker and counsel.

(ii)      **Financial Ability**: Purchaser has provided to Seller written evidence that Purchaser has the necessary financial ability to: (a) timely close the transaction contemplated by this Agreement; and (b) provide adequate assurance of future performance under all contracts proposed to be assumed and assigned in such Sale.

(iii)      **Adherence to Bid Procedures**: Purchaser agrees to abide by and honor the terms of the Bid Procedures Order in their entirety.

(iv)      **No Conditions**:  Purchaser is not relying on, and this Agreement does not include, any conditions or contingencies relating to financing, due diligence, internal approvals, or the absence of any Material Adverse Effect.

(v)      **Irrevocable Offer**: This Agreement constitutes an irrevocable offer to purchase the Property unless and until Seller accepts a higher bid and this Agreement is not selected as the Backup Bidder, and if selected as Backup Bidder, Purchaser agrees to hold upon this Agreement in accordance with the Bid Procedures Order (as defined in the Bid Procedures Order).

(vi)      **Consent to Jurisdiction**: Purchaser: (a) consents to the jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to Seller, the Chapter 11 Case, the Bid Procedures Order, this Agreement, or the construction and enforcement of documents relating to a sale of the Property with Seller; (b) waives any right to a jury trial in connection with any disputes relating to Seller, the Chapter 11 Case, the Bid Procedures Order, this Agreement, or the construction and enforcement of documents relating to any sale of the Property; and (c) consents to the entry of a final order or judgment by the Bankruptcy Court if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

(vii)      **No Collusion**: Purchaser has not: (a) engaged in any collusion with respect to the bidding or sale of any of the Property described herein; or (b) taken any other action to prevent a transparent and competitive process for the Property.

**4.3    Survival of Representations.**  The representations and warranties made in this Agreement by Seller and Purchaser shall be continuing and shall be conclusively deemed remade by Seller and Purchaser, respectively, as of the Closing Date, with the same force and effect as if first made on, and as of, the Closing Date, provided, however, all of the representations and warranties shall terminate as of the Closing Date.

**4.4** **"As Is"**. Except as otherwise expressly provided in this Agreement or in any documents to be executed and delivered at the Closing, (a) Seller has not made (and Purchaser has not relied upon), any promise, representation or warranty, express or implied, regarding the Property, whether made by Seller, on Seller's behalf or otherwise and (b) Purchaser will take the Property in its "as is, where is" condition without any other warranties express or implied. Purchaser acknowledges that, except as otherwise expressly provided in this Agreement or in any documents to be executed and delivered at the Closing, Purchaser (i) has entered into this Agreement with the intention of making and relying upon its own investigation or that of third parties with respect to the physical, environmental, economic and legal condition of the Property and (ii) is not relying upon any statements, representations or warranties of any kind by Seller or anyone acting or claiming to act on Seller's behalf.

**ARTICLE V**
**COVENANTS**

**5.1** **Seller's Pre-Closing Covenants**. From and after the Effective Date until the Closing or the earlier termination of this Agreement, Seller covenants and agrees that Seller shall operate and maintain the Business and the Property in the ordinary course of business consistent with past practices, subject to any limitations or conditions provided by the Bankruptcy Code or an order of the Bankruptcy Court.

**5.2** **Closing Documents**. On or prior to the Closing Date (but not earlier than the Sale Hearing), Seller and/or Purchaser (as applicable) shall deliver the following documents (collectively, the "**Closing Documents**") into escrow with the Escrow Agent to be released upon Closing:

**(a)** **Deed**. A Quitclaim deed without covenant for the Real Property, duly executed and acknowledged by Seller, conveying fee simple title to the Real Property subject only to the Permitted Encumbrances, and otherwise substantially in the form attached hereto as Exhibit A.

**(b)** **Bill of Sale**. One or more bills of sale for the Personal Property, duly executed by Seller, conveying all of the Personal Property to Purchaser, and otherwise substantially in the form attached hereto as Exhibit B.

**(c)** **Sale Order**. A certified copy of the Sale Order.

**(d)** **Assignment and Assumption Agreement**. One or more assignment and assumption agreements for the Intangible Property, duly executed by Seller and Purchaser, conveying all of the Intangible Property to Purchaser, and substantially in the form attached hereto as Exhibit C.

**(e)** **FIRPTA Affidavits**. One or more so-called "FIRPTA" or "Non-Foreign" affidavits, duly executed and acknowledged by Seller, in a form as contemplated by Section 1445 of the Code, and substantially in the form attached hereto as Exhibit D;

**(f)** **Settlement Statement**. The Settlement Statement, duly executed by Seller and Purchaser.

14

(g)     **Other Closing Deliverables**.  Original counterparts or copies of all other material documents and agreements, plans, specifications, contracts, licenses and permits pertaining to the Property, and any other documents reasonably requested by Purchaser, to implement the terms and provisions of this Agreement and to effectuate the sale and transfer of the Property to the Purchaser.

5.3     **Employees**.

(a)     **Rehiring**.  Purchaser shall have and is hereby granted the right (without any duty or obligation whatsoever to do so) to offer employment to such number of the Seller Employees, if any, which Purchaser chooses to hire for employment after Closing; provided, however, all offers of employment, if any, will be contingent upon the applicable Seller Employee meeting Purchaser's hiring criteria.  Seller agrees to cooperate with Purchaser through the Closing Date, and take all reasonable actions as may be necessary, to transition to Purchaser any of the Seller Employees hired by Purchaser.  Nothing in this Agreement shall be construed as granting Seller Employee any rights of continuing employment, compensation or benefits.

(b)     **Seller Employee Arrangements**.  Seller shall have full responsibility for, and Purchaser shall not assume or otherwise have any liability, obligation or expense with respect to, (i) any wages, severance or employment related obligations with respect to any Seller Employee to the extent related to, or arising out of, any Seller Employee's employment prior to the Closing Date or (ii) any claims related to any Seller Employee Benefit Arrangement.  If Purchaser expressly assumes such obligations and liabilities, then Purchaser shall indemnify, defend and hold harmless Seller from and against any and all Losses that Seller may incur as a result of any failure to pay any such obligations and liabilities to the extent that Purchaser receives a credit for the same.

(c)     **Survival**.   This Section 5.3 shall survive the Closing.

5.4     **Cooperation**.  Each of Seller and Purchaser shall cooperate with each other and use commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on their respective parts under this Agreement and applicable Legal Requirements to satisfy the conditions set forth in Article IV and to consummate the Closing.

**ARTICLE VI**
**CONDITIONS PRECEDENT**

6.1     **Purchaser's Conditions Precedent**.  The obligation of Purchaser to proceed with the Closing shall be subject to the satisfaction of the following conditions precedent on and as of the Closing Date:

(a)     **Entry of Sale Order**.  The Sale Order shall have been entered by the Bankruptcy Court and no court of competent jurisdiction shall have entered an order staying such Sale Order pending appeal.

(b)     **Seller Representations and Warranties**. The representations and warranties made by Seller in this Agreement and in the Seller Closing Documents shall be true and accurate in all material respects (without giving effect to any qualifications as to materiality

15

in such representations and warranties) on and as of the Closing Date as if first made on the Closing Date.

   **(c)**  **Seller Covenants**.  Seller shall have performed in all material respects all covenants and obligations required to be performed by it on or prior to the Closing Date under this Agreement and/or the Seller Closing Documents, including execution and delivery of all Seller Closing Documents.

   **(d)**  **Material Adverse Effect**.  There shall not have occurred, as of the Closing Date, any change, effect or circumstance that constitutes, or could reasonably be expected to constitute, a Material Adverse Effect.

   **(e)**  **Condition of Property**.  Subject to Article IX, the Property shall be in substantially the same condition as it was in on the Effective Date, normal wear and tear excepted.

   **6.2**  **Seller's Conditions Precedent**.  The obligation of Seller to proceed with the Closing shall be subject to the satisfaction of the following conditions precedent on and as of the Closing Date:

   **(a)**  **Entry of Sale Order**.  The Sale Order shall have been entered by the Bankruptcy Court and no court of competent jurisdiction shall have entered an order staying such Sale Order pending appeal.

   **(b)**  **Purchase Price**.  Purchaser shall have delivered the Purchase Price to be paid at Closing in accordance with Section 2.3.

   **(c)**  **Purchaser Representations and Warranties**.  The representations and warranties made by Purchaser in this Agreement and in the Purchaser Closing Documents shall be true and accurate in all material respects (without giving effect to any qualifications as to materiality in such representations and warranties) on and as of the Closing Date as if first made on the Closing Date.

   **(d)**  **Purchaser Covenants**.  Purchaser shall have performed all in all material respects all covenants and obligations required to be performed by it on or before the Closing Date under this Agreement and the Purchaser Closing Documents, including execution and delivery of all applicable Purchaser Closing Documents.

   **6.3**  **Failure of Conditions Precedent**.  If there is a failure of any of the conditions precedent to either party's obligation to close which is not due to a material breach of representation or other material default by the party in whose favor such condition runs, then the party in whose favor such condition runs shall have the right to terminate this Agreement by giving written notice thereof to the other party at or prior to the Closing, in which event the Escrow Agent shall return the Initial Deposit to Purchaser and neither party shall have any further obligations or liabilities to the other party hereunder except for the Surviving Obligations; provided, however, if the failure of any of the conditions precedent to either party's obligation to close is due to a material breach of a representation or warranty or other material default by the other party, then Article IX shall control. **For avoidance of doubt, except as provided in Sections 8.1 and 9.1, below, upon**

**Purchaser's payment, and Seller's acceptance of the Extension Deposit, under no circumstances shall the Initial Deposit or the Extension Deposit be refundable to Purchaser.**

### ARTICLE VII
### PRORATIONS; OTHER CLOSING MECHANICS

7.1     **Closing Prorations**.  Except as otherwise expressly set forth below in this Section 7.1, all items of income and expense with respect to the Property or the operation of the Business prior to the Closing Proration Time shall be for the account of Seller and all items of income and expense with respect to the Property or the operation of the Business from and after the Closing Proration Time shall be for the account of Purchaser, such that all items of income and expense with respect to the Property or the operation of the Business for the Closing Date shall be for the account of Purchaser.  Except as otherwise expressly set forth below, the following items shall be apportioned at the Closing as of the Closing Proration Time:

(a)     **Real Estate Taxes and Assessments.**  All ad valorem real estate Taxes or personal property Taxes and other ad valorem Taxes which have accrued or been assessed against or with respect to the Property during the year in which the Closing Date occurs shall be prorated as of the Closing Proration Time (regardless of when such Taxes are paid).  If the Tax bills for any such Taxes are not available by the Closing Date, such Taxes shall be prorated at Closing based upon the most recent Tax bills available.  Purchaser shall have the right to control any contest or abatement of any Taxes for the Property with respect to the year in which the Closing Date occurs and for all subsequent years.  If any refunds of any such prorated Taxes or shall be made after the Closing, the same shall be held in trust by Seller or Purchaser, as applicable, and shall be applied first to the unreimbursed costs incurred in obtaining the same, and the balance, if any, shall be released to Seller (to the extent such refunds relate to periods prior to the Closing Proration Time) and to Purchaser (to the extent such refunds relate to periods commencing from and after the Closing Proration Time).

(b)     **Revenues**.

(i)     Booking Deposits.  On or prior to the Closing Date, Seller shall provide Purchaser with a complete list which identifies all outstanding Bookings as of the Closing Date.  Purchaser shall honor all such Bookings after the Closing.

(ii)     Customer Vouchers.  On or prior to the Closing Date, Seller shall provide Purchaser with a complete list which identifies all Customer Vouchers, if any, outstanding as of the Closing Date.  At the Closing, Purchaser shall not receive a credit against the Purchase Price for the Customer Vouchers.

(iii)     Vending Machines.  Monies in vending machines (if any) will be removed by Seller for its own benefit as of the Closing Proration Time.

(iv)     Accounts Receivable.  No accounts receivable, room charges, rents or other amounts owed to Seller in connection with the operation or occupancy of the Business prior to the Closing Proration Time are to be credited,  assigned, or otherwise transferred to Purchaser, and no apportionment of any such amounts shall be made.

(c)     **Inventories and Supplies**.  No prorations or apportionments shall be made with respect to any Inventories and Supplies or any other Personal Property being conveyed under this Agreement (the costs for the same being included in the Purchase Price).

(d)     **Rental Payments and Security Deposits**.  All rents and other amounts payable which have been collected by or on behalf of Seller prior to Closing shall be prorated as of the Closing Proration Time.  To the extent that Seller or Purchaser receives any rents or other amounts belonging to the other hereunder, the party receiving such rents or other amounts shall hold the same in trust and shall promptly remit any portion thereof belonging to the other party to such other party.

(e)     **Utilities**.  Seller shall endeavor to obtain readings of all water, sewer, gas, electric or other utility meters located at the Property as of the Closing Date, and Seller and Purchaser shall cooperate to cause all such utilities to be transferred over to Purchaser's accounts as of the Closing Date.  If any such readings are not obtained as of the Closing Date, then, at the Closing, the charges for such unread utilities shall be prorated based upon the per diem charges for the most recent period for which such readings are available and Purchaser shall receive a credit against the Purchase Price in an amount equal to the prorated amount for all periods prior to the Closing Date.  Any utility deposits paid by Seller shall remain the property of Seller and Purchaser shall replace such utility deposits with its own deposit paid to the appropriate utility if applicable.

(f)     **Insurance Premiums**.  No insurance policies of Seller are to be assigned or otherwise transferred to Purchaser, and no apportionment of the premiums therefor shall be made.

(g)     **Estimates**.  If any of the foregoing items of income or expense cannot be apportioned at the Closing because of the unavailability of the amounts which are to be apportioned, such items shall be apportioned on the basis of a good faith estimate by the parties and adjusted and reconciled as soon as practicable after the Closing Date; provided, however, the party seeking any such adjustment shall send written notice thereof to the other party on or before the first anniversary of the Closing Date.

(h)     **Errors**.  If either party discovers any errors on the Settlement Statement, the parties shall make such adjustments and reconciliations as are necessary to correct such errors; provided, however, the party seeking such adjustment shall send written notice thereof to the other party on or before the first anniversary of the Closing Date.

(i)     **Adjustment to Purchase Price**.  If a net amount is owed by Seller to Purchaser pursuant to this Section 7.1, such amount shall be credited against the Purchase Price. If a net amount is owed by Purchaser to Seller pursuant to this Section 7.1, such amount shall be paid together with the Purchase Price.

(j)     **Preparation of Settlement Statement**.  No later than two (2) Business Days prior to the Closing Date, Seller shall deliver to Purchaser a draft Settlement Statement for Purchaser's review and approval, together with any back-up information or other data as may be reasonably requested by Purchaser with respect to any adjustments or prorations set forth on the Settlement Statement.

    **7.2**     <u>**Closing Costs**</u>.

      **(a)**     <u>**Purchaser's Costs**</u>.  Purchaser shall be responsible for the following transaction costs: (i) the costs and premiums incurred in connection with the Title Commitment and the Title Policy (including any applicable endorsements); (ii) all of the costs for the Survey; (iii) all other reasonable and customary closing costs typically paid for by purchasers in transactions similar to those contemplated hereby, and (iii) all other costs incurred by Purchaser in connection with this Agreement.

      **(b)**     <u>**Seller's Costs**</u>.  Seller shall be responsible for the following transaction costs: (i) commissions and other amounts owed to the Brokers; (ii) all other reasonable and customary closing costs typically paid for by sellers in transactions similar to those contemplated hereby; and (vi) all other costs incurred by Seller in connection with this Agreement.

    **7.3**     <u>**Survival**</u>.  All of the provisions of this <u>Article VII</u> shall survive the Closing or the earlier termination of this Agreement.

**ARTICLE VIII**
**CASUALTY AND CONDEMNATION**

    **8.1**     <u>**Casualty**</u>.  If, prior to the Closing, all or any portion of the Property is damaged or destroyed by fire or other casualty, Seller shall promptly deliver written notice thereof to Purchaser.  If any such casualty shall result in any material damage to the Property, then Purchaser shall have the right to terminate this Agreement by giving written notice thereof to Seller not later than five (5) Business Days after the date on which Purchaser receives Seller's notice of such casualty as aforesaid (and, if necessary, the Closing Date shall be extended until the date which is thee (3) Business Days following the expiration of such period in order to permit Purchaser to determine whether or not to exercise such termination right).  If Purchaser elects to terminate this Agreement as aforesaid, then the Escrow Agent shall return the Initial Deposit and Extension Deposit to Purchaser, whereupon this Agreement shall terminate and be of no further force and effect and neither party shall have any liability or obligation to the other hereunder except for the Surviving Obligations.  If any such casualty does not result in material damage to the Property or if Purchaser shall not elect to terminate this Agreement as aforesaid, then there shall be no abatement of the Purchase Price and Seller shall assign to Purchaser at the Closing all of Seller's rights to any applicable insurance proceeds with respect to such damage and there shall be credited against the Purchase Price: (a) the amount of any applicable insurance deductibles; and (b) the amount of any insurance proceeds previously received by Seller (other than the proceeds of any business interruption insurance to the extent applicable to periods prior to the Closing Date).  For purposes of this <u>Section 8.1</u>, any damage which Purchaser reasonably estimates will cost more than Five Hundred Thousand Dollars ($500,000.00) or take longer than three (3) months to complete repairs will be deemed to have resulted in material damage to the Property.

    **8.2**     <u>**Survival**</u>.  All of the provisions of this <u>Article VIII</u> shall survive the Closing.

19

## ARTICLE IX
## DEFAULTS AND INDEMNITIES

**9.1** **Pre-Closing Breach or Default by Seller.**  Prior to Closing, if (a) it is discovered that any representation or warranty made by Seller in this Agreement shall be untrue or misleading in any material respect (without giving effect to any qualifications therein as to materiality) or (b) Seller shall fail to perform any of its covenants or agreements contained herein, then Purchaser, as its sole and exclusive remedy, at law and/or in equity, may terminate this Agreement by delivering notice thereof to Seller, following which Escrow Agent shall return the Initial Deposit and Extension Deposit to Purchaser and neither party shall have any liabilities or obligations to the other hereunder, except for the Surviving Obligations.

**9.2** **Pre-Closing Breach or Default by Purchaser**.  Prior to Closing, if (a) it is discovered that any representation or warranty made by Purchaser in this Agreement shall be untrue or misleading in any material respect (without giving effect to any qualifications therein as to materiality), or (b) Purchaser shall fail to perform any of the material covenants and agreements contained herein to be performed by Purchaser at or prior to the Closing, Seller may terminate this Agreement by delivering written notice thereof to Purchaser and retain the Initial Deposit (and the Extension Deposit, if made), as liquidated damages and not as a penalty and Seller may thereafter sell the Property to the Backup Bidder or any other party as provided by the Sale Order.

## ARTICLE X
## MISCELLANEOUS

**10.1** **Brokers**.  Seller and Purchaser each represents to the other that it has dealt with no broker, finder or like agent in connection with this Agreement or the transactions contemplated hereby other than the Brokers.  Seller shall be responsible for paying any commissions or other amounts due to the Brokers in connection with this Agreement (subject to allowance by the Bankruptcy Court).

**10.2** **Performance on Business Days**.  If the date on which payment or performance of any obligation of a party hereunder is other than a Business Day, or the last day for the giving of any notice required or permitted hereunder is other than a Business Day, the time for such payment, performance or delivery shall automatically be extended to the first Business Day following such date.

**10.3** **Time of Essence**.  Time shall be of the essence with respect to the performance of each and every covenant and obligation, and the giving of all notices, under this Agreement.

**10.4** **Modification, Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought.  Any such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.

**10.5** **Delay Not a Waiver**.  Neither any failure nor any delay on the part of a party in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any Closing Document, shall operate as or

constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.

**10.6** **Notices**. Notices and other communications required by this Agreement shall be in writing and (i) delivered by hand with receipt; (ii) sent by recognized overnight delivery service; (iii) sent by certified or registered mail, postage prepaid, with return receipt requested. In addition to, and not as a substitute for notices described in subsections (i), (ii) and (iii) herein, notices and other communications required by this Agreement may also be sent by electronic mail. Notices transmitted to the then designated email address of the party intended to be given notice shall be deemed on the day of the transmission to the receiving party's email address so long as it is sent on such day, notices sent by a recognized overnight delivery service shall be deemed received on the next Business Day and notices delivered by certified or registered mail shall be deemed delivered three (3) days following posting. All notices shall be addressed as follows:

> If to Seller: Sandy Pines, LLC
> Attn: Tim Harrington, Manager
> 2 Livewell Drive
> Kennebunk, ME 04043
> Email:  timharrington@atlanticholdings.net

> with a copy to: Bernstein Shur
> 100 Middle Street
> Portland, ME 04101
> Attn: Sam Anderson, Esq.
> Email:  sanderson@bernsteinshur.com

> If to Purchaser: Streamside Parks, LLC
> c/o Jen Milam
> PO Box 1207
> Brentwood, TN 37024
> email: jen@streamsideparks.com

> with a copy to: Dickinson Wright
> Attn: John Faris, Esq.
> 200 Ottawa Ave. NW, Suite 900
> Grand Rapids, MI 49503
> Email: JFaris@dickinson-wright.com

or to such other address as a party may be designated by a proper notice. Notices shall be deemed to be effective upon receipt or refusal of the addressee to accept delivery. Any notice of any party may be given by such party's counsel.

**10.7** **Assignment; Successors and Assigns; Third Party Beneficiaries.** This Agreement and all rights and obligations hereunder shall not be assignable by any party without the written consent of the other party, except that Purchaser may assign this Agreement in whole or in part to one or more special purpose entities (provided that Purchase shall remain liable for all of its obligations under this Agreement). This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Except as otherwise expressly set forth herein, this Agreement is not intended and shall not be construed to

create any rights in or to be enforceable in any part by any Person other than the parties hereto and their respective successors and permitted assigns.

**10.8**   **Headings.**  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**10.9**   **Severability.**  If any term, covenant or condition of this Agreement, or the application thereof to any person or circumstance, shall be determined to be unenforceable by a court of competent jurisdiction (the "**Offending Provision**"), then the remainder of this Agreement, or the application of such term, covenant or condition to persons, entities or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each term, covenant and condition of this Agreement shall be valid and enforced to the fullest extent permitted by law; provided, however, that the parties affected by the Offending Provision shall endeavor in good faith, within sixty (60) days after the date such determination is made, to agree upon alternative provisions which shall have the same practical effect as the Offending Provision and upon any agreement being reached, the new provision shall be incorporated into and form a part of this Agreement.

**10.10**  **Conflict; Construction of Documents**.  In the event of any conflict or inconsistency between the provisions of this Agreement and any of the other Closing Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Agreement and the Closing Documents and that neither this Agreement nor any of the Closing Documents shall be subject to the principle of construing their meaning against the party which drafted same.

**10.11**  **Counterparts**.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Each such counterpart may be delivered by facsimile or e-mail (in .pdf format) and any signatures which are so delivered by facsimile or e-mail shall be deemed original signatures for all purposes, it being expressly agreed that each party to this Agreement shall be bound by any such signature and shall accept such a signature from the other party.

**10.12**  **Entire Agreement**.  This Agreement and the Closing Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby.

**10.13**  **Attorneys' Fees.**  Notwithstanding anything contained herein to the contrary, if any lawsuit or arbitration or other legal proceeding arises in connection with the interpretation or enforcement of this Agreement, subject to the Bankruptcy Code, the prevailing party therein shall be entitled to receive from the other party the prevailing party's costs and expenses, including reasonable attorneys' fees incurred in connection therewith, in preparation therefor and on appeal therefrom, which amounts shall be included in any judgment therein.

**10.14**  **Governing Law and Forum Selection**.  THIS AGREEMENT AND THE OTHER CLOSING DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF

ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CLOSING DOCUMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL EACH BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF MAINE.  THE PARTIES CONSENT TO ALL DISPUTES RELATED TO THIS AGREEMENT BEING DETERMINED BY THE BANKRUPTCY COURT.

     **10.15** **Waiver Of Jury Trial**.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CLOSING DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

     **10.16** **Statement of Limited Liability.**  NO OFFICER, SHAREHOLDER, EMPLOYEE OR AGENT OF PURCHASER SHALL BE HELD TO ANY PERSONAL LIABILITY, JOINTLY OR SEVERALLY, FOR ANY OBLIGATION OF, OR CLAIM AGAINST, PURCHASER.  ALL PERSONS DEALING WITH PURCHASER IN ANY WAY SHALL LOOK ONLY TO THE ASSETS OF PURCHASER, FOR THE PAYMENT OF ANY SUM OR THE PERFORMANCE OF ANY OBLIGATION OF PURCHASER .

     **10.17** **Survival.**  All of the provisions of this Article X shall survive the Closing or any termination of this Agreement.

[Remainder of page intentionally left blank; signature page follows.]

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as a sealed instrument as of the Effective Date.

**PURCHASER:**

Streamside Signature Acquisitions, LLC                ,
a Wyoming, limited liability company

By: _____    5/29/2026

Name:  Jennifer S. Milam

Its:  Chief Growth Officer

**SELLER:**

SANDY PINES, LLC,
a Maine limited liability company

By: _____

Name:  Timothy Harrington

Title:  Sole Member and Authorized Party

24

*FORM OF CAMPGROUND PURCHASE AND SALE AGREEMENT*

## SCHEDULE 1.1

## LAND DESCRIPTION

**(277 Mills Road, Kennebunkport)**

A certain lot or parcel of land, with the buildings and improvements thereon, situated in the Town of Kennebunkport, in the County of York and State of Maine, lying southerly of State Highway Number 9, and being the same property described in a deed from Philip J. Spang, Jr. to James R. Spang dated December 13, 1974 and recorded in the York County Registry of Deeds in Book 2062, Page 82. The verbatim perimeter description of said certain lot according to the aforementioned deed being as follows:

A certain lot or parcel of pasture land situate in the Town of Kennebunkport, aforesaid, lying on the Beachwood Road, so-called, and bounded, beginning at the Northwesterly corner of the parcel hereby described and at land formerly of J.G. Deering and Son and land now or formerly of Ivory E. Davis; thence running Easterly by said Road to the lower side of a pair of bars, joining land now or formerly of Peter J. Smith; thence running Southeasterly by land formerly of said Smith to an iron pipe set in the ground and marsh at land formerly of John Smith, at Batson's River; thence running Southerly by said River to marsh land of the heirs of one Coleman; thence on by said River to marsh land now or formerly of Howard Benson; thence by said Benson marsh to land formerly of Charles Goodrich; thence by the said Goodrich land to land formerly of Andrew Perkins; and thence by land formerly of J.G. Deering and Son to a comer; thence by land of said Deering and land formerly of one Davis to said Road and the place begun at.

Excepting hereof that parcel of land sold to Willard W. Wentz, and Helen Wentz, as joint tenants, by deed of Clara A. Williams acknowledged April 18, 1950 and recorded in the York County Registry of Deeds, Book 1157, Page 205.

This conveyance is made subject to a water line easement as more specifically contained in a deed from James R. Spang, Jr, to Spang Enterprises, Inc. dated December 13, 1974 and recorded in the York County Registry of Deeds in Book 2062 Page 80; and to the terms and conditions of a "Water Association Agreement" dated February 21, 2007 and recorded in the York County Registry of Deeds in Book 15116, Page 290.

Benefits and burdens - the property hereinbefore described is hereby conveyed: (1) subject to such utility service and other easements on, over, under or across said property as may now have any legal existence; (2) with the benefit of all appurtenant utility service easements and all appurtenant rights of way; and (3) subject to and with the benefit of applicable municipal, state and federal zoning, land use and conservation ordinances, regulations and statutes.

Further conveying to the Grantee herein the premises described and conveyed in "Corrective Deed to Establish Property Line and Boundary Line Agreement" from The Trust for Public Land to TSFP dated May 11, 2000 and recorded in the York County Registry of Deeds in Book 10029, Page 125.

Being the same premises conveyed to Sandy Pines, LLC by deed from JTJ Development, LLC dated January 2, 2018 and recorded in the York County Registry of Deeds in Book 17640, Page 501.

**SCHEDULE 2.3(b)**

**PURCHASE PRICE ALLOCATION**

LAND: $ 2,025,000

GOODWILL: $ 675,000

WHIMSICAL RETREATS: $ 4,725,000

FF&E: $ 2,700,000

BUILDINGS: $ 3,375,000

**TOTAL:** $ 13,500,000 **(To be revised prior to closing)**

## SCHEDULE 2.4

### ASSUMED CONTRACTS

*[Purchaser to confirm final list in Schedule 2.4]*

### List of Potentially Assumed Contracts and Leases

| Counterparty | Description of Contract / Lease | Cure Amount |
|---|---|---|
| 1-800-Pack-Rat, LLC | Storage container agreement | $0.00 |
| Reliable Networks | Computer and network support and remote monitoring agreement | $0.00 |
| Nexamp Inc. | Solar electricity agreement | $0.00 |
| LightSpeed | Property management and reservation agreement | $0.00 |
| Huntington National Bank | Golf cart lease agreement / Lessee | $4,427.00 |
| First Data Merchant Services LLC | Merchant processor agreement | $0.00 |
| Authorize.net | Merchant processor agreement | $0.00 |
| Spectrum | Cable services agreement | $0.00 |
| Great Works Internet | Internet services agreement | $0.00 |
| Cintas Corporation | AED service agreement | $0.00 |
| CampSpot | SaaS Agreement, property management software | $0.00 |
| Resnexus | Property management and reservation agreement | $0.00 |
| Webfones | Phone system | $281.73 |

**SCHEDULE 4.1(d)**

**LITIGATION**

None other than Chapter 11 Case.

## SCHEDULE 4.1(e)

## LICENSES AND PERMITS

Licenses:

Eating and Campground License – Est ID: 4247

Elevator Inspection License– Vertical Life Registration Number: VL4998

Liquor License – License Number: RET-18-102694

Pool License – Est ID: 23712

Resale Certificate License – Certificate Number: 1188741

Special Amusement Permit for Dancing and Entertainment

Victualer License

## EXHIBIT A

## FORM OF DEED

QUITCLAIM DEED WITHOUT COVENANT
(Maine Statutory Short Form)


KNOW ALL PERSONS BY THESE PRESENTS that **SANDY PINES, LLC**, with a mailing address of 277 Mills Road, Kennebunkport, Maine 04046 ("**Grantor**"), FOR CONSIDERATION PAID, hereby grants to _____, a _____ ("**Grantee**"), that certain lot or parcel of land, together with any improvements thereon and all rights appurtenant thereto, commonly known and designated 277 Mills Road, Kennebunkport, Maine 04046, as more particularly described in Exhibit A attached hereto and made a part hereof.

IN WITNESS WHEREOF, SANDY PINES, LLC has caused this instrument to be executed by Timothy Harrington, its Sole Member and Authorized Party, thereunto duly authorized, as of this ___ day of _____ ___, 2026.

Sandy Pines, LLC


By:_____
Name: Timothy Harrington
Its: Sole Member and Authorized Party


STATE OF MAINE
YORK COUNTY, ss.                                    _____ ___, 2026


Personally appeared the above-named Timothy Harrington, in his capacity as Sole Member and Authorized Party of Sandy Pines, LLC, and acknowledged the foregoing instrument to his free act and deed in his said capacity and the free act and deed of said Sandy Pines, LLC.

Before me,


_____
Notary Public
Print Name: _____
[SEAL]

## EXHIBIT A
### (277 Mills Road, Kennebunkport)

A certain lot or parcel of land, with the buildings and improvements thereon, situated in the Town of Kennebunkport, in the County of York and State of Maine, lying southerly of State Highway Number 9, and being the same property described in a deed from Philip J. Spang, Jr. to James R. Spang dated December 13, 1974 and recorded in the York County Registry of Deeds in Book 2062, Page 82. The verbatim perimeter description of said certain lot according to the aforementioned deed being as follows:

A certain lot or parcel of pasture land situate in the Town of Kennebunkport, aforesaid, lying on the Beachwood Road, so-called, and bounded, beginning at the Northwesterly corner of the parcel hereby described and at land formerly of J.G. Deering and Son and land now or formerly of Ivory E. Davis; thence running Easterly by said Road to the lower side of a pair of bars, joining land now or formerly of Peter J. Smith; thence running Southeasterly by land formerly of said Smith to an iron pipe set in the ground and marsh at land formerly of John Smith, at Batson's River; thence running Southerly by said River to marsh land of the heirs of one Coleman; thence on by said River to marsh land now or formerly of Howard Benson; thence by said Benson marsh to land formerly of Charles Goodrich; thence by the said Goodrich land to land formerly of Andrew Perkins; and thence by land formerly of J.G. Deering and Son to a comer; thence by land of said Deering and land formerly of one Davis to said Road and the place begun at.

Excepting hereof that parcel of land sold to Willard W. Wentz, and Helen Wentz, as joint tenants, by deed of Clara A. Williams acknowledged April 18, 1950 and recorded in the York County Registry of Deeds, Book 1157, Page 205.

This conveyance is made subject to a water line easement as more specifically contained in a deed from James R. Spang, Jr, to Spang Enterprises, Inc. dated December 13, 1974 and recorded in the York County Registry of Deeds in Book 2062 Page 80; and to the terms and conditions of a "Water Association Agreement" dated February 21, 2007 and recorded in the York County Registry of Deeds in Book 15116, Page 290.

Benefits and burdens - the property hereinbefore described is hereby conveyed: (1) subject to such utility service and other easements on, over, under or across said property as may now have any legal existence; (2) with the benefit of all appurtenant utility service easements and all appurtenant rights of way; and (3) subject to and with the benefit of applicable municipal, state and federal zoning, land use and conservation ordinances, regulations and statutes.

Further conveying to the Grantee herein the premises described and conveyed in "Corrective Deed to Establish Property Line and Boundary Line Agreement" from The Trust for Public Land to TSFP dated May 11, 2000 and recorded in the York County Registry of Deeds in Book 10029, Page 125.

Being the same premises conveyed to Sandy Pines, LLC by deed from JTJ Development, LLC dated January 2, 2018 and recorded in the York County Registry of Deeds in Book 17640, Page 501.

**EXHIBIT B**

**FORM OF BILL OF SALE**

# BILL OF SALE

THIS BILL OF SALE (this "**Bill of Sale**") is made as of this <u>26</u> day of <u>May</u>, 2026, by: (a) Sandy Pines, LLC, a Chapter 11 debtor and debtor in possession in the U.S. Bankruptcy Court for the District of Maine ("**Seller**") and (b) <u>Streamside Signature Acquisitions, LLC</u> ("**Purchaser**").

# RECITALS

**A.**      Seller is the owner and operator of the campground, general store, and related assets known as "Sandy Pines Campground" generally located at 277 Mills Road, Kennebunkport, Maine (the "**Business**").

**B.**      In order to operate the Business, Seller owns certain personal property, including (a) the Books and Records; (b) the FF&E; and (c) the Inventories and Supplies (collectively, the "**Assets**").

**C.**      Seller and Purchaser are bound by that certain Campground Purchase and Sale Agreement dated contemporaneously hereto (the "**Purchase Agreement**"), with respect to, among other things, the acquisition of the Assets from Seller.

**D.**      The Purchase Agreement requires Seller to convey all of Seller's right, title and interest in, to and under the Assets to Purchaser.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby agrees as follows:

1.      Unless the context otherwise requires, all capitalized terms used, but not otherwise defined herein, shall have the meanings provided in the Purchase Agreement.

2.      Seller does hereby unconditionally, absolutely, and irrevocably grant, bargain, sell, transfer, assign, convey, set over and deliver unto Purchaser all of Seller's right, title and interest in and to any and all of the Assets.

3.      Seller grants, bargains, sells, transfers, assigns, conveys, sets over and delivers the Assets to Purchaser on an "**AS IS**," "**WHERE IS**" and "**WITH ALL DEFECTS**" basis without any express or implied warranties of any kind or nature, except as otherwise specifically set forth in the Purchase Agreement, and as approved for sale, transfer and assignment pursuant and subject to the Sale Order.

4.      This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

5.      This Bill of Sale and the legal relations of the parties hereto shall be governed by and construed and enforced in accordance with the laws of the State of Maine, without regard to its principles of conflicts of law.

[signature to follow]

IN WITNESS WHEREOF, Seller has hereto executed this Bill of Sale as of the date set forth above.

SANDY PINES, LLC

By: Timothy Harrington
Name:   Timothy Harrington
Title:   Sole Member and Authorized Party

**EXHIBIT C**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

# ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Assignment**") is made as of the __26__ day of _____May_____, 2026 (the "**Effective Date**"), between (a) Sandy Pines, LLC, a debtor and debtor in possession in a Chapter 11 case pending in the U.S. Bankruptcy Court for the District of Maine ("**Seller**"); and (b) Streamside Signature Acquisitions, LLC a Wyoming, limited liability company ("**Purchaser**" and Purchaser, together with Seller, the "**Parties**").

R E C I T A L S

This Assignment is premised on the following understandings of the Parties:

A.      Seller and Purchaser are parties to that certain Campground Purchase and Sale Agreement, dated contemporaneously hereto (the "**Purchase Agreement**"), pursuant to which Seller has agreed, among other things, to sell, assign, transfer and convey to Purchaser the Property.[1]

B.      In connection with the sale and purchase of the Property, Seller has agreed to assign to Purchaser all of Seller's right, title and interest in and to, and Purchaser has agreed to assume from Seller all of Seller's obligations and liabilities under, the Assumed Contracts as well as the other Assumed Liabilities.

C.      Seller also has agreed to assign to Purchaser the Licenses and Permits to the extent assignable under applicable law.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.      Assignment. Seller, for itself, its successors and assigns, hereby conveys, sells, assigns, sets over and transfers to Purchaser as of the Effective Date, all right, title and interest in and to the Assigned Contracts and the Licenses and Permits. Such assignment is being made pursuant to the terms of, and subject to the limitations set forth in, the Purchase Agreement and in accordance with the Sale Order.

2.      Assumption. In accordance with the Purchase Agreement, Purchaser, for itself, its successors and assigns, hereby assumes and agrees to observe, keep, carry out, perform and satisfy the liabilities arising solely on or after the Effective Date under the Assumed Contracts, as well as the other Assumed Liabilities referenced in the Purchase Agreement and in accordance with the Sale Order.

3.      Purchase Agreement Governs; Sale Order.  This Assignment is delivered pursuant to, and is subject to the express representations, warranties, covenants, and agreements set forth in the Purchase Agreement.  To the extent that any provision of this Assignment is inconsistent with the provisions of the Purchase Agreement, the provisions of the Purchase Agreement shall govern,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to such terms in the Purchase Agreement.

subject to the Sale Order.

4.  Further Assurances. Seller covenants with Purchaser and Purchaser covenants with Seller that each will execute or procure any additional documents reasonably necessary to establish the rights of the other hereunder.

5.  Counterparts. This Assignment may be executed by the parties in counterparts, in which event the signature pages thereof shall be combined in order to constitute a single original document.  A signed copy of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

6.  Binding Effect. This Assignment shall be binding upon, and, shall inure to the benefit of Seller, Purchaser and their respective successors and assigns.

7.  Governing Law; Jurisdiction.  This Assignment shall be governed, construed and interpreted by, and in accordance with, the laws of the State of Maine, excluding choice of law rules.

Executed as of the first date above written.


Seller:

SANDY PINES, LLC

By: *Timothy Harrington*
Name: Timothy Harrington
Title:  Sole Member and Authorized Party



Purchaser:


_____

By:_____
Name:
Title:

## EXHIBIT D

## FORM OF FIRPTA CERTIFICATE

## NON-FOREIGN PERSON AFFIDAVIT AND CERTIFICATION
### (ENTITY – SANDY PINES, LLC)

The undersigned person, TIMOTHY HARRINGTON, an individual residing in the State of Maine, hereby certifies that such person is the Sole Member of SANDY PINES, LLC, a Maine limited liability company ("**Seller**"), and that, in such capacity, such person is authorized and empowered to execute and deliver this NON-FOREIGN PERSON AFFIDAVIT AND CERTIFICATION (this "**Certification**"), dated as of the Effective Date (defined below), for and on behalf of Seller, and such person hereby further certifies as follows:

1.　　This Certification is being delivered pursuant to, and in accordance with, that certain Campground Purchase and Sale Agreement, dated on near or even date herewith, by and among Seller and Purchaser (as defined therein) (together with any and all amendments, restatements, supplements, and other modifications thereto, collectively, the "**PSA**"). Any capitalized terms that are used but not otherwise defined in this Certification shall have the meanings ascribed to them in the PSA.

2.　　Seller is not a "foreign person" as such quoted term is referenced in 26 C.F.R. § 1.1445-2, and Seller is not, and Seller has not been, a "United States real property holding corporation" as such quoted term is defined in 26 U.S.C. § 897 during the applicable period in 26 U.S.C. § 897.

3.　　Seller's U.S. employer identification number is: 82-2746331.

4.　　Seller's office address is: 277 Mills Rd, Kennebunkport, ME 04046.

Seller hereby acknowledges and agrees that this Certification may be disclosed to the U.S. Internal Revenue Service by Purchaser and that any false statement contained herein could be punishable by fine, imprisonment, or both.

AS OF THE EFFECTIVE DATE, UNDER PENALTIES OF PERJURY, THE UNDERSIGNED PERSON HEREBY DECLARES THAT THE UNDERSIGNED PERSON HAS EXAMINED THIS CERTIFICATION, THAT, TO THE BEST OF THE UNDERSIGNED PERSON'S KNOWLEDGE AND BELIEF, THIS CERTIFICATION IS TRUE, CORRECT, AND COMPLETE, AND THAT THE UNDERSIGNED PERSON FURTHER DECLARES THAT THE UNDERSIGNED PERSON HAS THE REQUIRED AUTHORITY TO SIGN THIS CERTIFICATION FOR AND ON BEHALF OF SELLER.

**Effective Date:** _____, 2026.

IN WITNESS WHEREOF, Seller has executed and delivered this Non-Foreign Person Affidavit and Certification as of the Effective Date.

**SELLER:**

SANDY PINES, LLC.

By: _Timothy Harrington_____
　　　DocuSigned by:
　　　9B8BD9F00FD1400...
Name:　Timothy Harrington
Title:　Sole Member and Authorized Party

## EXHIBIT E

## FF&E EXHIBIT

All FF&E owned by Seller as of the Closing, including the following:

**Vehicles**:

Vintage Station Wagon

Vintage Ace Traveler Camper

2014 GMC Sierra

2009 Ford F-250

Fisher Plow

2017 Cushman Shuttle

2018 Cushman Shuttle

2018 Cushman Hauler

**Inventory**:

| Item | Description |
| --- | --- |
| **Amenities** | |
| Shampoo/Cond | Personal Cleanser |
| Lotion | Personal Moisterizer |
| Body Wash/Individual | Personal wash |
| Soap Bars | Personal Cleanser |
| Hand Soap | For Park Mdels |
| Prewrapped Cups | Personal Plastic Cups |
| Makeup Wipes | Personal Cleanser |
| Laundry Bags | Plastic Bag |
| **Toiletries** | |
| Paper Towels | Guest Paper Towel |
| Toilet Paper | Bathroom Tissue |
| Tork Paper Towels | Bathhouse Paper Towels |

**Towels**

| | |
|---|---|
| Bath | White Towels |
| Bath Mat | Bath Mats for Park Models |
| Small Kitchen Towels | Kitchen Towels for Park Models |
| Large Kitchen Towels | Kitchen Towels for Park Models |
| Hand Towels - Black | Black Towels |

**Linen**

| | |
|---|---|
| New King Spreads | Bed Blanket |
| Old King Spreads | Bed Blanket |
| King Microloft Spare | Spare Blanket |
| King Waffle | Spare Blanket |
| Queen Spread | Bed Blanket |
| Queen Waffle | Spare Blanket |
| New Full Spread | Bed Blanket |
| Old Full Spread | Bed Blanket |
| New Twin Spread | Bed Blanket |
| Old Twin Spread | Bed Blanket |
| Twin Waffle | Spare Blanket |
| Twin Spare Blanket | Spare Blanket |
| King Flat | Bed Sheet |
| King Fitted | Bed Sheet |
| Queen Flat | Bed Sheet |
| Queen Fitted | Bed Sheet |
| Full Flat | Bed Sheet |
| Full Fitted | Bed Sheet |
| Twin Flat | Bed Sheet |
| Twin Fitted | Bed Sheet |
| King Pillow Case | Pillow Cover |
| King Pillow Protect | Pillow Protector |
| Queen Pillow Case | Pillow Cover |
| Queen Pillow Protect | Pillow Protector |
| Bed Ends | Decrative Blanket |
| Shower Liner | Nylon Shower Curtain |

**Chemicals**

| | |
|---|---|
| Bleach | Sanitizer and Laundry Aid |

| Multi-surface cleaner | Bathroom Cleaner |
|---|---|
| Spray Away | Glass Cleaner |
| Scrubbing Bubbles | Shower Cleaner/Sanitizer |
| Degreaser | General Purpose |
| Pump Soap | Bathhouse Dispensers |
| Resolve | Carpet Spot Cleaner |
| Oxy Clean | Stain Remover |
| Murphys Oil | Wood and Floor Cleaner |
| Laundry Soap | Soap |
| Laundry Softener | Fabric Softener |

**Misc**

| XL Gloves | Disposable Gloves |
|---|---|
| LG Gloves | Disposable Gloves |
| Medium Gloves | Disposable Gloves |
| Plastic Trash Bags | 24x24 Black |

## **Whimsical Retreats**:

83169 - Beach Rose 7
Crossed Keys Society

83172 - Beach Rose 8
Chickchaw Trail

83062 - Beach Rose 11
Midge

83173 - Beach Rose 12
Ritchie

83098 - Beach Rose 13
Summer's End

83170 - Beach Rose 14
Rosemary

83168 - Beach Rose 15
Margo

83171 - Beach Rose 21
Belafonte

83167 - Beach Rose 22
Camp Ivanhoe

## **Additional FF&E**:

Equipment
Furniture
Signage
website
furniture & equipment
Signage
FF&E Phase 2 A-Frames & Hideway Huts
FF&E Phase 2 Safari & Glamp Tents
Phase 2 A-Safari & Glamp Tents
FF&E Phase 2 Sheds & Camp Carriages
Oasis Dome
New Maintenance Tin

Docusign Envelope ID: 281A2404C664-842R-81F3281060315863F

Campers - staff Housing

Hoshizaki Ice Maker

equipment - phase 4

furnishings - phase 4

Montana Canvas, Inc

Maine Recreation and Design Playground Equ

Chad Little Outdoor Power Brush Cutter

Trailer

16 Tents

Custom 18x24x6 white tent

Trailer

Pool wave cleaner

Pool sand filter

Mini Split for Meeting Room

Initial  DS

Addendum 1

A. <u>Extension of Outside Closing Date</u>. Notwithstanding anything contained in Section 2.2 of the Agreement, the Purchaser shall have the right, upon written notice to Seller and delivery of the non-refundable Extension Deposit otherwise required under the Purchase Agreement, to extend the Outside Closing Date to July 31, 2026. Upon Purchaser's timely delivery of such notice and payment of the non-refundable Extension Deposit, the Outside Closing Date shall automatically be extended to July 31, 2026, and Seller's consent shall not be required. Except as expressly modified herein, all other terms and conditions of the Purchase Agreement shall remain unchanged and in full force and effect.

**SELLER:**
SANDY PINES, LLC,
a Maine limited liability company

By: Timothy Harrington

Name: Timothy Harrington

Title: Sole Member and Authorized Party

**PURCHASER:**

Streamside Signature Acquisitions, LLC
A Wyoming limited liability company

By: Jen S. Milam
Its: Chief Growth Officer

Docusign Envelope ID: 381A200434864-842B-81F32810603D863F